CAMERON FINANCIAL CORPORA-
TION, Petitioner,

v.

BOARD OF GOVERNORS OF the FED-
ERAL RESERVE SYSTEM,
Respondent,

Purolator Courier Corp.,
Intervenor.

No. 73-2001.

United States Court of Appeals,
Fourth Circuit.

Argued April 3, 1974.

Decided June 4, 1974.

---

J. Carlton Fleming, Charlotte, N. C., for petitioner.

Irving Jaffee, Asst. Atty. Gen., Leonard Schaitman and Eloise E. Davis, Dept. of Justice, for respondent.

Samuel K. Abrams and Roger W. Langsdorf, Washington, D. C., for intervenor.

Before HAYNSWORTH, Chief Judge, and BUTZNER and ADAMS,[*] Circuit Judges.

ADAMS, Circuit Judge.

This appeal presents a formidably complicated question of statutory construction. Specifically, we must decide whether section 4(a)(2) of the Bank Holding Company Act[1] extends so-called "grandfather" privileges to a bank holding company which controlled, prior to June 30, 1968,[2] a bank subsidiary that also engaged in limited courier activities, but which "spun-off" the courier activities to a nonbanking subsidiary subsequent to June 30, 1968.

[*] United States Circuit Judge for the Third Circuit, sitting by designation.

1. June 30, 1968 is the critical date for determining whether and under what conditions certain activities may be conducted by a bank holding company after 1970.

2. Section 4(a)(2) of the Bank Holding Act provides as follows:

"Except as otherwise provided in this chapter, no bank holding company shall—

.      .      .      .      .

after two years from the date of which it becomes a bank holding company, or in the case of a company which has been continuously affiliated since May 15, 1955, with a company which was registered under the Investment Company Act of 1940, prior to May 15, 1955, in such a manner as to constitute an affiliated company within the meaning of that Act, after December 31, 1978, or, in the case of any company which becomes, as a result of the enactment of the Bank Holding Company Act Amendments of 1970, a bank holding company on the date of such enactment, after December 31, 1980, retain direct or indirect ownership or control of any voting shares of any company which is not a bank or bank holding company or engage in any activities other than (A) those of banking or of managing or controlling banks and other subsidiaries authorized under this chapter or of furnishing services to or performing services for its subsidiaries, and (B) those permitted under paragraph (8) of subsection (c) of this subject to all the conditions specified in such paragraph or in any order or regulation issued by the Board under such paragraph: *Provided,* That a company covered in 1970 may also engage in those activities in which directly or through a subsidiary (i) it was lawfully engaged on June 30, 1968 (or on a date subsequent to June 30, 1968 in the case of activities carried on as the result of the acquisition by such company or subsidiary, pursuant to a binding written contract entered into on or before June 30, 1968, of another company engaged in such activities at the time of the acquisition), and (ii) it has been continuously engaged since June 30, 1968 (or such subsequent date). The Board by order, after opportunity for hearing, may terminate the authority conferred by the preceding proviso on any company to engage directly or through a subsidiary in any activity otherwise permitted by that proviso if it determines, having due regard

## 1. The Factual Background

There exists no disagreement concerning the factual background prompting this litigation. Cameron Financial Corporation, a bank holding company, was established on May 4, 1968. It controlled, among other things, one bank, First Union National Bank of North Carolina. First Union operated courier services at the time of Cameron's organization. Several months after Cameron was organized, on July 29, 1968, Courier Express Corporation was incorporated and Cameron shortly thereafter acquired all of Courier's common stock. Courier Express proceeded to purchase all of the equipment used by First Union in its courier activities. The net result of this reorganization was to remove the courier activities from the regulatory authority of the Comptroller of the Currency[3] and to leave them largely unregulated. Courier Express is presently authorized to transport a variety of materials intrastate in North Carolina and Virginia and interstate between North Carolina and South Carolina, Virginia and Tennessee.

Prior to December 31, 1970, the Bank Holding Company Act did not cover one-bank holding companies. However, on that date, Congress amended the Act primarily to bring within the Act's regulatory scope one-bank holding companies like Cameron. The Board of Governors of the Federal Reserve, pursuant to section 4(a)(2) of the Act, notified Cameron that it may be entitled to grandfather privileges under that section, which had been added in 1970, and requested Cameron to furnish information relating to its courier operations. Cameron complied with the Board's request by furnishing such information and, in addition, claimed grandfather rights for the courier services operated by its nonbanking subsidiary, Courier Express. The Board, however, advised Cameron that only activities conducted by a nonbanking subsidiary prior to June 30, 1968 were entitled to grandfather privileges under section 4(a)(2). Since Cameron had effected the transfer of the assets and, hence, the courier operations from First Union to Courier Express *after* June 30, 1968, no nonbanking subsidiary of Cameron was engaged, prior to the critical date, in the activities sought to be grandfathered. The Board, therefore, concluded that "no indefinite grandfather benefits accrue[d] to Cameron Financial with re-

to the purposes of this chapter that such action is necessary to prevent undue concentration of resources, decreased or unfair competition, conflicts of interest, or unsound banking practices; and in the case of any such company controlling a bank having bank assets in excess of $60,000,000 on or after December 31, 1970, the Board shall determine within two years after such date (or, if later, within two years after the date on which the bank assets first exceed $60,000,000), whether the authority conferred by the preceding proviso with respect to such company should be terminated as provided in this sentence. Nothing in this paragraph shall be construed to authorize any bank holding company referred to in the preceding proviso, or any subsidiary thereof, to engage in activities authorized by that proviso through the acquisition, pursuant to a contract entered into after June 30, 1968, of any interest in or the assets of a going concern engaged in such activities. Any company which is authorized to engage in any activity pursuant to the preceding proviso or subsection (d) of

this section but, as a result of action of the Board, is required to terminate such activity may (notwithstanding any otherwise applicable time limit prescribed in this paragraph) retain the ownership or control of shares in any company carrying on such activity for a period of ten years from the date on which its authority was so terminated by the Board.

The Board is authorized, upon application by a bank holding company, to extend the two year period referred to in paragraph (2) above from time to time as to such bank holding company for not more than one year at a time, if, in its judgment, such an extension would not be detrimental to the public interest, but no such extensions shall in the aggregate exceed three years. (Emphasis added)

3. So long as the courier services were conducted by First Union, a national bank, the Comptroller of the Currency exercised regulatory authority with respect to them. The Comptroller's regulatory jurisdiction, however, does not extend to nonbanking subsidiaries of one-bank holding companies such as Courier Express.

spect to the activities carried on by the Courier Express Corporation." Cameron thereupon filed a petition for review of the Board's determination.

## 2. Section 4(a)(2) of the Bank Holding Company Act

Although the Bank Holding Company Act provides for the imposition of significant limitations on the conduct of nonbanking activities by bank holding companies, section 4(a)(2), nonetheless, permits a bank holding company to "engage in those activities in which directly or through a subsidiary . . . it was lawfully engaged on June 30, 1968 . . . and it has been continuously engaged since June 30, 1968. . . ."

The Board may require a holding company to cease activities falling within the parameters of the grandfather proviso if, after an opportunity for a hearing has been afforded, "it determines, having due regard to the purposes of this chapter that such action is necessary to prevent undue competition, conflicts of interest, or unsound bank practices. . . ." Otherwise, activities within the proviso's terms may continue indefinitely.

## 3. Cameron's Contention

Since the grandfather proviso of section 4(a)(2) stipulates that a bank holding company may "engage in those activities in which directly or through a subsidiary . . . it was lawfully engaged on June 30, 1968 . . . ." and since Cameron's banking subsidiary, First Union, was conducting courier activities on June 30, 1968, it claims that its courier activities come within the grandfather proviso. Cameron contends that the term "subsidiary," as used in the grandfather proviso embraces a banking as well as a nonbanking subsidi-

ary controlled by a bank holding company prior to June 30, 1968. It points to the definition of "subsidiary" contained in section 2(d) [4] and notes that the definition makes no distinction between a banking and a nonbanking subsidiary. Cameron also points to other provisions that specifically refer to a banking, as opposed to a nonbanking subsidiary,[5] or contrariwise, to a nonbanking, as opposed to a banking subsidiary.[6] Cameron reasons from the draftsmen's facility to distinguish between a banking and a nonbanking subsidiary in these instances that when the draftsmen failed so to distinguish in section 4(a)(2), they intended the appellation "subsidiary" to refer to both a banking as well as a nonbanking subsidiary.

Cameron also asserts that the legislative history suggests no intention on the part of Congress to limit the applicability of the grandfather clause to activities conducted by a nonbanking subsidiary. It endeavors to buttress its view of the Congressional intent by suggesting that removing from the grandfather clause activities conducted by any banking subsidiary of a bank holding company inhibits the organizational flexibility with respect to grandfathered activities that Congress sought to attain through section 4(c)(11).[7] Cameron asserts, it would seem, that since grandfathered activities may be transferred between subsidiaries under section 4(c)(11), we ought to decide that a particular activity is, in fact, entitled to grandfather privileges.

Further, Cameron claims that the evident concern of Congress in enacting the 1970 Amendments to the Bank Holding Company Act, including section 4(a)(2), was to check anticipated *future* abuses of the single bank holding company de-

---

4. 12 U.S.C. § 1841(d).

5. *E. g.*, 12 U.S.C. § 1842(d).

6. *E. g.*, 12 U.S.C. § 1842(a)(4).

7. ". . . such prohibitions [of section 4] shall not, with respect to any . . . bank holding company, apply to—

(11) shares owned directly or indirectly by a company covered in 1970 in a company which does not engage in any activities other than those in which the bank holding company, or its subsidiaries, may engage by virtue of this section. . . ." 12 U.S.C. § 1843(c)(11).

vice, and since Cameron was, on June 30, 1968, carrying on courier services, albeit through its banking subsidiary, those activities cannot be properly considered in the category of future abuses.

Cameron also points out that while activities conducted by *nonbanking* subsidiaries of single bank holding companies were completely unregulated prior to 1970, the activities of *banking* subsidiaries were regulated either by national authorities such as the Comptroller or by state authorities. According to Cameron, if the previously unregulated activities of a nonbanking subsidiary could remain essentially unregulated by virtue of the grandfather proviso, it would follow that extending the grandfather proviso to the previously regulated activities, i. e. the courier services conducted by First Union, is consistent with the purposes of the Act generally and section 4(a)(2) in particular. Cameron appears to suggest in this regard that so long as Congress was prepared to tolerate the potential for abuse inherent in allowing some unregulated activities to continue unregulated, it was also prepared to tolerate the potential for abuse in deregulating previously regulated activities.

Finally, Cameron contends that the Board, itself, has recognized the benign nature of courier activities when conducted by a nonbanking subsidiary by amending its Regulation Y[8] to include courier services among those activities "so closely related to banking or controlling banks as to be a proper incident thereto."[9]

### 4. The Board's Contentions

The Federal Reserve Board counters Cameron's arguments that are based on the language of the Act, and specifically the definition of "subsidiary" contained in the statute, by emphasizing the section and subsection head-

ings of section 4(a)(2) which, according to the Board, indicate that the grandfather provision does not cover banking subsidiaries.[10] Further, the definition of "subsidiary" in section 2(d), according to the Board, is designed primarily to delineate more fully the scope of the authority conferred upon the Board by the Bank Holding Company Act and was not addressed to the use of the word "subsidiary" in section 4(a)(2).

Also, the Board contends that since Congress recognized that banking subsidiaries were already regulated by agencies other than the Federal Reserve, i. e., Comptroller of the Currency, Federal Deposit Insurance Corporation, and state authorities, Congress intended to grant to the Federal Reserve Board authority to regulate only the previously unregulated nonbanking subsidiaries, an intent at odds with the interpretation of section 4(a)(2) urged by Cameron.

Finally, the Board claims that permitting a bank holding company to transfer activities to a nonbanking subsidiary—in the process freeing the transferred activities from regulation because of the grandfather proviso—creates the opportunity for the type of competitive abuse against which the 1970 amendments to the Bank Holding Company Act were specifically designed to guard.

### 5. The Objectives and Statutory Scheme of the Bank Holding Company Act

Both Cameron and the Board offer plausible syntactical arguments supporting their competing views of the reach of the term "subsidiary" in section 4(a)(2). This antiphony, by itself, strongly suggests that the bare words of the statute cannot conclusively answer the question posed by this appeal. With the process of statutory construction in this posture, it is necessary to examine

---

8. 12 C.F.R. §§ 225.1–5.

9. 38 Fed.Reg. 32126 (1973).

10. The section and subsection headings of section 4(a)(2) read as follows:

"*§ 1843 Interest in nonbanking organizations.* [a] Ownership or control of voting shares of any company not a bank; *engagement in activities other than banking.*"

the statutory scheme more broadly and to acquire an appreciation of the general considerations motivating its enactment.[11] These two inquiries are inextricably intertwined and it would seem, therefore, unobjectionable first to attempt to reach an informed conclusion regarding the considerations underlying the enactment of the Bank Holding Company Act generally and the 1970 Amendments in particular.

Prior to 1956, a bank holding company, then completely unregulated, was utilized to achieve geographical expansion and service diversification unattainable by its banking subsidiary alone because the banking subsidiary was subject to national or state regulation.[12] Misgivings were developing among Congressmen that proliferation of the bank holding device was having anticompetitive effects in the economy. Banking resources were becoming increasingly concentrated and the combination in one enterprise of a major creditor in a locality, a bank, and another service business created a condition ripe for exploitation through tying relationships.[13] In response to these concerns, Congress enacted the Bank Holding Company Act of 1956.

In essence, the Act brought multi-bank holding companies under the regulatory authority of the Federal Reserve Board. It limited the acquisition of banking subsidiaries and restricted the scope of allowable diversification. But the 1956 Act did not extend to *one*-bank holding companies. Since concentration of banking resources was facilitated by the acquisition of several banking subsidiaries, the bank holding company that controlled only one bank did not represent as significant a threat to competition as the multi-bank holding company. Further, the general small size, at the time, of one-bank holding companies and the absence of evidence of competitive abuse of the one-bank holding company device provided support in terms of the Act's objectives for exempting from the reach of the Act the holding companies that controlled only one bank.

But several large banks responded to the promise of stricter regulation as the result of court rulings limiting the authority of the Comptroller of the Currency to permit national banks wide-ranging entreprenurial discretion by turning to the one-bank holding company device.[14] "The nations largest banks," including the six largest,[15] "rushed to form one-bank holding companies, many of which engaged in commercial and industrial enterprises not even arguably within banking powers, such as TV broadcasting, furniture manufacturing, and pizza parlors."[16] In view of the large growth of the assets held by the one-bank holding company industry, and in view of the theoretical freedom of a one-bank holding company to engage in any business, or acquire anything it desires . . . ,"[17] Congress amended the Act to include within its regulatory scheme one-bank holding companies as well as the multi-bank holding companies already covered.

The 1970 Amendments were directed primarily at the portent of serious anti-

11. Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527, 537–746 (1947).

12. Note, Implementation of the Bank Holding Company Act Amendments of 1970: The Scope of Banking Activities, 71 Mich.L.Rev. 1170, 1170–72 (1973) (hereinafter Note) Chase, The Emerging Financial Conglomerate: Liberalization of the Bank Holding Company Act, 60 Geo.L.J. 1225, 1226–27 (1972).

13. *See* S.Rep.No.609, 84th Cong., 1st Sess. 2 (1955); Chase, The Emerging Financial Conglomerate: Liberalization of the Bank Holding Company Act, 60 Geo.L.J. 1225, 1231–32 (1972).

14. Note at 1176.

15. S.Rep.No.1084, 91st Cong. 2d Sess. 3 (1970), U.S.Code Cong. & Admin.News 1970, p. 5519.

16. Note at 1176 (footnote omitted).

17. S.Rep.No.1084, 91st Cong. 2d Sess. 3 (1970), U.S.Code Cong. & Admin.News 1970, p. 5522.

competitive consequences presented by the trend of unregulated one-bank holding company proliferation and expansion.[18] Congress was not, therefore, eager to effect a dramatic alteration of the existing organizational structure of the banking industry. Furthermore, Congress "felt that the one-bank holding companies existing at the time set in the clause, most of which were quite small, had not caused great problems and was thus reluctant to require them to undergo the hardships of divestiture, which would be particularly harsh for small banks." [19]

Turning to an examination of how these considerations are reflected in the statutory scheme, we note that one-bank holding companies that seek to engage in nonbanking activities or to continue to engage in such activities initiated subsequent to the grandfather date of June 30, 1968, must seek Board approval pursuant to section 4(c)(8), which provides:

[S]uch prohibitions shall not, with respect to any other bank holding company, apply to—

shares of any company the activities of which the Board after due notice and opportunity for hearing has determined (by order or regulation) to be so closely related to banking or managing or controlling banks as to be a proper incident thereto. In determining whether a particular activity is a proper incident to banking or managing or controlling banks the Board shall consider whether its performance by an affiliate of a holding company can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competi-

tion, conflicts of interest, or unsound banking practices. In orders and regulations under this subsection, the Board may differentiate between activities commenced de novo and activities commenced by the acquisition, in whole or in part, of a going concern; . . .[20]

Thus, "[u]nder section 4(c)(8), an application may not be approved without an affirmative showing that public benefits exceed harms. . . ." [21]

If, however, the activity of the one-bank holding company falls within the scope of the grandfather proviso of section 4(a)(2), the Board may order the bank holding company to disassociate itself from the activity "if it determines, having due regard to the purposes [of the Act], that such action is necessary to prevent undue concentration of resources, decreased or unfair competition, conflicts of interest, or unsound banking practices . . ." Although section 4(a)(2) dispenses with the requirement that the Board consider possible beneficial consequences resulting from allowing the bank holding company to participate in a given activity, the bank holding company need not establish that the particular activity is "closely related to banking" as it must under section 4(c)(8).

Even after the Board has ordered a one-bank holding company to terminate an activity, the holding company may retain control of the subsidiary for a period of ten years. In contrast, a denial of approval under section 4(c)(8) apparently requires termination of the activity forthwith. Hence, even though both sections—4(a)(2) and 4(c)(8)—possess features that tend to facilitate the Board's efforts to accomplish the statutory objectives, the Board may well prefer remitting a bank holding company to proceedings pursuant to section 4(c)(8)

18. *Id.* at 5.

19. Note at 1181.

20. 12 U.S.C. § 1843(c)(8).

21. Note at 1182-83.

because this latter section makes available immediate termination and places the burden on the bank holding company to show that the activity is closely related to banking.

### 6. Cameron's Claim for Grandfather Privileges and the Statutory Objectives and Scheme

The geographic scope of the courier services conducted by Cameron has broadened since the post-June 30, 1968 transfer of these activities from Cameron's banking to its nonbanking subsidiary. It also appears that Cameron now offers a wider variety of courier services than it did when all courier operations were conducted by its banking subsidiary. So long as the courier services were conducted by the banking subsidiary, the Board lacked regulatory authority over them. Indeed, so long as banking authorities such as the Comptroller of the Currency were overseeing the courier activities when they were conducted by the bank itself, it would appear that the danger of anti-competitive consequences was substantially mitigated. However, when Cameron transferred these courier activities to its nonbanking subsidiary, there existed no regulatory authority guarding against potential competitive abuse unless, of course, the transfer occurred after June 30, 1968, which in this case it did, and the term "subsidiary" in section 4(a)(2), as the bank contends, is interpreted to refer solely to nonbanking subsidiaries.

To prevent the formerly regulated activities of a banking subsidiary to escape regulation through transfer of such activities to a nonbanking subsidiary seems a persuasive reason for declining to extend grandfather privileges to the activities conducted prior to June 30, 1968 by a banking subsidiary.[22] To construe the ambiguous term "subsidiary" to relate to a nonbanking subsidiary only, and thus to achieve this result, seems entirely consistent with the objectives of the 1970 Amendments.

Deciding that Cameron's courier activities do not qualify under section 4(a)(2) does not necessarily mean that Cameron must divest itself of its courier business. It still may show that its courier services are closely related to banking under section 4(c)(8). Certainly, Cameron's case before the Board in a section 4(c)(8) proceeding would be substantially strengthened by the recent addition to Regulation Y that includes certain courier services among the activities regarded as closely related to banking. Cameron would, of course, have to establish that its own services do come within the ambit of the addition to Regulation Y. At the same time, it would be able to press the argument made here that Cameron's participation in courier activities has pro-competitive effects.

On balance, it would seem more consistent with the congressional objectives to require Cameron to seek approval of its expanded courier activities in a section 4(c)(8) proceeding than to permit such activities to continue on a perhaps unregulated basis by virtue of section 4(a)(2).

### 7. Conclusion

In sum, since we agree with the Board that "subsidiary" in section 4(a)(2) does not refer to a banking subsidiary, Cameron's courier activities are not entitled to grandfather privileges under that section. Accordingly, Cameron's petition for review will be denied.

22. *But cf.* Note at 1179 n. 75.