PATAGONIA CORPORATION,
Petitioner,

v.

BOARD OF GOVERNORS OF the
FEDERAL RESERVE SYSTEM,
Respondent.

No. 73–2432.

United States Court of Appeals,
Ninth Circuit.

May 19, 1975.

As Amended June 5, 1975.

804

Jack J. Ross (argued), Phoenix, Ariz., for petitioner.

Donald Etra (argued), U. S. Dept. of Justice, Washington, D. C., for respondent.

## OPINION

Before ELY and CHOY, Circuit Judges, and WEIGEL,* District Judge.

* The Honorable Stanley A. Weigel, United States District Judge, Northern District of California, sitting by designation.

ELY, Circuit Judge:

This case presents several difficult questions concerning the proper interpretation and application of the grandfather proviso that appears within section 4(a)(2) of the Bank Holding Company Act, as amended (hereinafter "the Act"), now codified as 12 U.S.C. § 1843(a)(2) (1970). Section 4(a)(2) was enacted as a part of the Bank Holding Company Act Amendments of 1970 (hereinafter "the 1970 Amendments"), Pub.L.No.91–607, 84 Stat. 1760.

Patagonia Corporation, the petitioner, is an Arizona based, one-bank holding company which on June 30, 1968, the date on which section 1843(a)(2) [1] grandfather rights accrued, owned 20.005 percent of the outstanding capital stock of the state-chartered Pima Savings and Loan Association of Tucson (hereinafter "Pima"). Between June 30, 1968, and December 31, 1970, when the 1970 Amendments became effective, Patagonia increased its ownership of Pima to 100 percent by purchasing all of Pima's remaining outstanding stock. [2]

Ruling that Patagonia's grandfather rights do not extend to the 79 + percent of Pima's stock that the holding company acquired after June 30, 1968, the Board of Governors of the Federal Reserve System (hereinafter "the Board") has ordered Patagonia to divest that amount of Pima's stock before December 31, 1980. 38 Fed.Reg. 18411, 59 Fed.Res. Bull. 539 (1973). [3] Patagonia petitions for review of the Board's Order, invoking the jurisdiction of this court under 12 U.S.C. § 1848 (1970). We have concluded that the Board's Order must be vacated and the cause remanded for further administrative proceedings.

## I. Statutory Background

For reasons that have been fully discussed elsewhere, [4] the Congress, by enacting the 1970 Amendments, subjected one-bank holding companies, i. e., those holding companies owning or otherwise controlling only one bank, to the same federal controls that had previously been established for multi-bank holding companies. It has thus been the principal result that since the effective date of the 1970 Amendments, both one-bank and multi-bank holding companies have been prohibited by statute from engaging in activities except banking and those non-banking activities that the Board has determined to be "so closely related to banking or managing or controlling banks as to be a proper incident thereto." 12 U.S.C. §§ 1843(a), (c)(8) (1970). The Board does not consider the activities normally conducted by savings and loan associations or institutions to be "related to banking." [5] 12 C.F.R. §§ 225.4, 225.126(h) (1974).

Within section 1843(a)(2), however, Congress inserted a grandfather proviso for the purpose of creating a conditional exemption from the ban against non-banking activities for one-bank holding

1. All sections of the Act are hereinafter numbered as they appear in Title 12, United States Code (1970).

2. Except directors' qualifying shares.

3. The Board's Order deals not only with Patagonia's ownership of Pima but also with Patagonia's grandfather rights to several other activities. Patagonia complains only of that portion of the Board's Order that requires Patagonia to divest itself of the Pima stock that it *acquired after June 30, 1968.* No other portion of the Board's Order is before us, and we emphasize that our disposition of Patagonia's present Petition does not affect any other portion of the Board's Order.

4. *See, e. g.,* Cameron Financial Corp. v. Board of Governors, 497 F.2d 841, 845–47 (4th Cir. 1974); S.Rep.No.91–1084, 91st Cong., 2d Sess. 1–4 (1970) (1970 U.S.Code Cong. & Admin. News, pp. 5519, 5520–22); Chase, The Emerging Financial Conglomerate: Liberalization of the Bank Holding Company Act, 60 Geo.L.J. 1225, 1233–36 (1972); Note, Implementation of the Bank Holding Company Act Amendments of 1970: The Scope of Banking Activities, 71 Mich.L.Rev. 1170, 1171–76 (1973); Legislation Note, The Bank Holding Company Act Amendments of 1970, 39 Geo.Wash.L.Rev. 1200, 1208–13 (1971).

5. The Board has indicated, however, that it intends to reexamine the question whether the *savings and loan business is banking related. See* 12 C.F.R. § 225.126(h) n.1 (1974).

companies that had been in existence on June 30, 1968, but that were not subjected to federal control until 1970.[6] The pertinent statutory language, embodying both the generally applicable ban against non-banking activities and the grandfather proviso, reads as follows:

(a) Except as otherwise provided in this chapter, no bank holding company shall—

\* \* \* \* \* \*

(2) \* \* \* after December 31, 1980, retain direct or indirect ownership or control of any voting shares of any company which is not a bank or bank holding company or engage in any activities other than (A) those of banking or of managing or controlling banks and other subsidiaries authorized under this chapter or of furnishing services to or performing services for its subsidiaries, and (B) [those determined by the Board to be banking-related]: Provided, That a company covered in 1970 may also engage in those activities in which directly or through a subsidiary (i) it was lawfully engaged on June 30, 1968 \* \* \*, and (ii) it has been continuously engaged since June 30, 1968 \* \* \*.

12 U.S.C. § 1843(a)(2) (1970). Subject to two limitations, which are discussed below, the grandfather clause authorizes an eligible one-bank company to continue to engage in those non-banking activities in which it lawfully was engaged, either directly or through a subsidiary, on June 30, 1968, and in which it has continuously remained so engaged since that date.

The Congressional committees that drafted the 1970 Amendments noted two reasons for the Congressional decision to grandfather the on-going activities of eligible one-bank holding companies. First, the committee reports reveal that Congress was principally concerned that the one-bank holding company device might be employed to effect serious anti-competitive abuses in the future. Both the House and Senate committees agreed that they had seen little or no evidence that the one-bank holding companies that existed in 1970 had already engaged in serious anti-competitive practices. H.R.Rep.No.1747, 91st Cong., 2d Sess. 24 (1970) (1970 U.S.Code Cong. & Admin. News, pp. 5561, 5574–75) (conference report); S.Rep.No.1084, 91st Cong., 2d Sess. 4, 5 (1970) (1970 U.S.Code Cong. & Admin.News, pp. 5519, 5522, 5523). See Cameron Financial Corp. v. Board of Governors of the Federal Reserve System, 497 F.2d 841, 846–47 (4th Cir. 1974). Second, Congress noted that some one-bank holding companies, principally those in smaller cities, had existed for long periods of time and had provided services and opportunities for local communities that otherwise might not have been available. H.R.Rep.No.1747, supra at 23–24 (1970 U.S.Code Cong. & Admin. News at pp. 5574–75).

Congress was aware, however, that even the grandfathered activities of existing one-bank holding companies might, in the future, be conducted in ways that could frustrate the principal purposes of the Act. Accordingly, Congress attached two limitations to the section 1843(a)(2) grandfather proviso. First, a one-bank holding company may not expand its grandfathered activities through the acquisition of an interest in a "going concern" that also is engaged in the grandfathered business. Second, the statute empowers the Board to terminate a holding company's grandfathered activities if the Board finds, after notice and opportunity for a hearing, that such termination is necessary "to prevent undue concentration of resources, decreased or unfair competition, conflicts of interest, or unsound banking practices." 12 U.S.C. § 1843(a)(2) (1970). The Board may institute proceedings at any time to determine whether a holding company's grandfathered activities should be terminated; however, the statute specifically required the Board to initiate such proceedings by the end of 1972 for the grandfathered activities of each one-bank holding company that on December

6. See the definition of the phrase, "company covered in 1970." 12 U.S.C. § 1841(b) (1970).

31, 1970, controlled a bank that had assets in excess of $60-million.[7]

## II. Proceedings Before the Board

Before the Board, Patagonia strongly urged that the section 1843(a)(2) grandfather proviso entitles it to retain its full, 100 percent, ownership of Pima. Patagonia's argument was predicated on its claim that on June 30, 1968, it had the power to exercise a controlling influence over the management and policies of Pima, even though it owned only 20.-005 percent of Pima's stock. Therefore, Patagonia argued, Pima was its subsidiary on June 30, 1968, as the word, "subsidiary," is defined in 12 U.S.C. § 1841(d)(3) (1970). Section 1841(d)(3), also added to the Act by the 1970 Amendments, defines a bank holding company subsidiary as

> any company with respect to the management or policies of which such bank holding company has the power, directly or indirectly, to exercise a controlling influence, as determined by the Board, after notice and opportunity for hearing.

Section 1843(a)(2) grandfathers those non-banking activities in which eligible one-bank holding companies were engaged, either directly or through a subsidiary, on June 30, 1968. Patagonia asserted, consequently, that on the crucial date, it was engaged, through its subsidiary, Pima, in the business of operating a savings and loan institution. Patagonia concluded, therefore, that its savings and loan activities are grandfathered and that it was not barred by the Act from acquiring Pima's remaining outstanding stock.

Patagonia first apprised the Board of its claim to grandfather rights for its full ownership of Pima in an April, 1972, response to a Board inquiry about the holding company's ongoing grandfathered activities. Shortly thereafter, on July 3, 1972, and following informal consultations with the Board's staff, Patagonia filed with the Board a document styled as an application for a Board determination, pursuant to section 1841(d)(3), that on June 30, 1968, Patagonia had power to exercise a controlling influence over Pima. Patagonia's application provided information that as of the critical date, Patagonia owned 20.005 percent of Pima's capital stock and that Patagonia had placed three representatives on Pima's fifteen-member board of directors. The application further stated that as of June 30, 1968, Patagonia had already announced its intention to acquire additional Pima stock. Finally, Patagonia attached six affidavits to its application, three from the Patagonia members of Pima's board of directors and three from Pima directors whom Patagonia did not directly control. Each affiant stated his view as to the strength of Patagonia's influence over Pima's affairs. Patagonia noted in its application that it believed that it was entitled to a hearing on the controlling influence question but stated that such a hearing would be sought only if the Board's staff

---

**7.** As pertaining to the two limitations on grandfather rights, section 1843(a)(2) reads as follows:

> * * * The Board by order, after opportunity for hearing, may terminate the authority conferred by the preceding proviso on any company to engage directly or through a subsidiary in any activity otherwise permitted by that proviso if it determines, having due regard to the purposes of this chapter that such action is necessary to prevent undue concentration of resources, decreased or unfair competition, conflicts of interest, or unsound banking practices; and in the case of any such company controlling a bank having bank assets in excess of $60,- 000,000 on or after December 31, 1970, the Board shall determine, within two years after such date (or, if later, within two years after the date on which the bank assets first exceed $60,000,000), whether the authority conferred by the preceding proviso with respect to such company should be terminated as provided in this sentence. Nothing in this paragraph shall be construed to authorize any bank holding company referred to in the preceding proviso, or any subsidiary thereof, to engage in activities authorized by that proviso through the acquisition, pursuant to . a contract entered into after June 30, 1968, of any interest in or the assets of a going concern engaged in such activities.

was of the preliminary view that Patagonia's power to exercise a controlling influence did not exist.

On December 31, 1970, when the 1970 Amendments became effective, the bank that Patagonia owned, the Great Western Bank and Trust Company of Phoenix, held assets in excess of $60 million. Consequently, on October 19, 1972, the Board published a notice that as required by section 1843(a)(2), it was undertaking a review of Patagonia's grandfathered activities to determine whether those activities should be terminated. 37 Fed. Reg. 22414, 22415 (1972).[8] Patagonia's activity in respect to Pima was described in the Board's notice as "Ownership of 20.005 percent interest in savings and loan associations." Patagonia did not request a hearing on the question whether the Board should terminate its June 30, 1968, 20.005 percent interest in Pima. Rather, even after the Board's October 19, 1972, notice, Patagonia's representatives continued to meet in informal conferences with Board staff members and to submit data and legal memoranda in an attempt to establish Patagonia's claim to its retention of its 100 percent interest in Pima.

After completing its review of Patagonia's grandfathered activities, the Board issued the Order that is currently before us, the Order requiring Patagonia to divest itself of all Pima stock that it acquired after June 30, 1968. The Board's Order permits Patagonia to retain the 20.005 percent interest in Pima that it owned on June 30, 1968.[9]

The Board's Order made no mention of Patagonia's July 3, 1972, application for a Board determination that on the critical date, Patagonia had the power to exercise a controlling influence over Pima. One week later, however, on July 6, 1973, in a letter signed by the Board's Secretary, and reproduced in full at CCH Fed.Banking L.Rep. ¶ 96,005 (1973), the Board inforu ed Patagonia that it had denied the holding company's application for a controlling influence determination. The letter stated that

. . . [t]he Board is of the view that a determination of subsidiary status under [section 1841(d)(3)] is one to be initiated and made by the Board after notice and opportunity for a hearing in enforcing its regulatory authority and not for the purpose of conferring grandfather benefits pursuant to a claim by a bank holding company.

The letter continued by explaining that the legislative history of section 1841(d)(3) revealed that the section was added to the Act at the suggestion of the Board and other regulatory agencies for the sole purpose of enabling the Board to identify and regulate, or order divestiture of, companies that are bank holding company subsidiaries in practical effect, even though the parent-subsidiary relationship involved did not meet the previously-established, objective definitions of "subsidiary." Those definitions

---

8. The Board also notified Patagonia by letter of the impending review of Patagonia's grandfathered activities.

9. The portion of the Board's Order that pertains to Patagonia's grandfather rights as to Pima states:

Registrant [Patagonia] now owns 100 per cent of Pima Savings and Loan Association ("Pima"), Tucson, Arizona, the fifth largest savings and loan association in Arizona with savings deposits of about $101 million as of May 31, 1972. However, on June 30, 1968, Registrant held only 20.005 per cent of the stock of Pima; Registrant purchased the remaining shares of Pima during the period from June 30, 1968, to December 31, 1970. Accordingly, on the basis of grandfather benefits, Registrant may retain indefinitely its 20.005 per cent interest in Pima, and must reduce its holdings in Pima to that level by December 31, 1980, or secure Board approval under § 4(c)(8) of the Act to retain the additional shares of Pima.

38 Fed.Reg. 18411, 18412, 59 Fed.Res.Bull. 539, 540 (1973). Section 4(c)(8) of the Act, 12 U.S.C. § 1843(c)(8) (1970), exempts from the section 1843(a)(2) ban against non-banking activities those activities that the Board has determined to be banking-related. To obtain authorization to retain its full ownership of Pima under section 1843(c)(8), Patagonia would need to convince the Board, in rule-making proceedings, to reverse its current position, see text accompanying n.5, supra, that, as to the banking industry as a whole, the savings and loan business is not banking-related.

required that the holding company either vote 25 percent of the subsidiary's stock or elect a majority of the subsidiary's directors. 12 U.S.C. §§ 1841(d)(1), (d)(2) (1970).

Finally, however, the Secretary wrote that even though the Board was not required to make the controlling influence determination that Patagonia had requested, the Board had carefully examined Patagonia's application and had concluded, on the basis of the evidence that Patagonia had submitted, that the holding company did not have the power, on June 30, 1968, to exercise a controlling influence over the management or affairs of Pima.

### III. The Definition of "Subsidiary"

The Board's Order of June 29, 1973, states no reasons for the Board's ruling that Patagonia must divest the portion of its Pima stock that it acquired after June 30, 1968. Nevertheless, the Board Secretary's July 6, 1973, letter makes clear the Board's view that Congress did not intend that the section 1841(d)(3) definition of "subsidiary" should apply for the purpose of establishing section 1843(a)(2) grandfather rights. Patagonia vigorously disputes the Board's interpretation of the statute.

We note, initially, that the Board's interpretation of section 1841(d)(3) seems quite inconsistent with the statute's self-evident meaning. Section 1841(d), which defines "subsidiary," appears in the definitions section of the Act. Furthermore, the section deals specifically with the question that Patagonia has presented, i.

e., under what conditions will a company be considered, for the various purposes of the Act, to be a subsidiary of an already-identified bank holding company. The section establishes three tests for identifying the holding company-subsidiary relationship. A company becomes a bank holding company's subsidiary if (1) the holding company controls 25 percent of the voting shares of the company's stock, (2) the holding company controls the election of a majority of the company's directors, or (3) the Board determines, after notice and opportunity for a hearing, that the holding company "has the power, directly or indirectly, to exercise a controlling influence" over the company's management or policies.

Nothing in the statute indicates that Congress intended to give the word "subsidiary," as it is used in the grandfather clause, a narrower definition than that established in the definitions portion of the Act. In the absence of such an indication, the logical assumption is that by defining "subsidiary" in section 1841(d), Congress intended that definition to apply to "subsidiary" wherever "subsidiary" appears in the Act.

The Board argues, however, that the legislative history of the 1970 Amendments requires a different conclusion. In the Board's view, the legislative history reveals that Congress added section 1841(d)(3) to the Act solely to enable the Board to expand its regulatory jurisdiction over companies that are bank holding company subsidiaries in substance, although not in previously recognized form.[10]

---

**10.** Normally, courts resort to legislative history for aid in interpreting a statute only when the statute's language is ambiguous or a literal interpretation of the statute would thwart Congress's purpose or lead to an absurd result. See, e. g., I.T.T. v. G.T.E., —— F.2d ——, —— (9th Cir. 1975). But this rule, like other rules of statutory interpretation, is not inflexible. See, e. g., Portland Cement Ass'n v. Ruckelshaus, 158 U.S.App.D.C. 308, 486 F.2d 375, 379–80 (1973), cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974); Maun v. United States, 347 F.2d 970, 976 (9th Cir. 1965). Although we think that none of the normal conditions requiring resort to legislative history is present in this case, we have carefully studied the legislative history of the 1970 Amendments so as not to overlook any aspect of the Board's contentions.

We do not agree with the Board's suggestion that the statutory language of the 1970 Amendments is unclear as to whether the definition of "subsidiary" in section 1841(d) applies to the word, "subsidiary," as it is used within the grandfather proviso. Cameron Financial Corp. v. Board of Governors, 497 F.2d 841 (4th Cir. 1974), upon which the Board relies, involves a different question. There, the court found ambiguity as to whether the word,

The portions of the legislative history upon which the Board principally relies do not expressly concern the controlling influence test in section 1841(d)(3). Rather, the Board's references deal with a similar test that Congress added, in the 1970 Amendments, to the section 1841(a)(2) definition of the term, "bank holding company." Subsection (C) of section 1841(a)(2) permits the Board to identify a holding company as a *bank* holding company if the Board finds, after notice and opportunity for a hearing, that the holding company exercises a controlling influence over the management or policies of a bank or another bank holding company. The Congressional committee reports reveal quite clearly that Congress added section 1841(a)(2)(C) to the Act at the request of the Board and other regulatory agencies to enable those agencies to identify, and subject to federal regulation, those holding companies whose relationships with banks meet the controlling influence test. *See, e. g.,* S.Rep.No.91–1084, 91st Cong., 2d Sess. 6 (1970) (1970 U.S.Code Cong. & Admin.News, pp. 5519, 5524–25).

■ As to the controlling influence definition of "subsidiary," section 1841(d)(3), the committee reports state only that the section was added ". . to conform [the then-existing definition of "subsidiary"] with the changes made with respect to the definition of a bank holding company." S.Rep.No.91–1084, *supra* at 24 (1970 U.S.Code Cong. & Admin.News at p. 5541). After analyzing section 1841(d)(3) in the light of its relationship to the controlling influence test in section 1841(a)(2)(C), however, we have no doubt that the Board is correct in asserting that Congress intended, by enacting the section, to expand the Board's authority to identify and regulate bank holding company subsidiaries.

■ Nevertheless, the legislative history does *not* prove that Congress in-

tended that the section 1841(d)(3) definition of "subsidiary" should be applied *only* for the purpose of expanding the Board's jurisdiction. The legislative history contains no indication whatsoever that Congress intended that the controlling influence definition of "subsidiary" should not apply for the purpose of establishing grandfather rights. That question simply is not addressed. From proof in the legislative history that Congress intended one result, the Board seeks to infer that Congress intended not to reach a second result that also is consistent with the statutory language. The inference drawn by the Board fails logically to follow. *Cf.* Maun v. United States, 347 F.2d 970, 976 (9th Cir. 1965). It is possible that Congress never considered whether the new definition of "subsidiary" should apply for the purpose of establishing grandfather rights, but that fact, standing alone, could not justify a departure from the plain import of the statutory language. *See* Eastern Air Lines, Inc. v. Civil Aeronautics Board, 122 U.S.App.D.C. 375, 354 F.2d 507, 511 (1965).

■ Also in support of its restricted view of the meaning of "subsidiary" in the grandfather proviso, the Board relies upon the familiar rule that grandfather provisos, along with other, similar clauses that operate in derogation of a statute's dominant purpose, should be narrowly construed. *See, e. g.,* Crescent Express Lines v. United States, 320 U.S. 401, 409, 64 S.Ct. 167, 88 L.Ed. 127 (1943). Canons of statutory construction, are, however, no more than aids to assist in ascertaining legislative intent. *See, e. g.,* National Railroad Passenger Corp. v. National Association of Railroad Passengers, 414 U.S. 453, 458, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). And we are unwilling to apply the canon that the Board has suggested for the purpose of restricting the meaning of a word that

"subsidiary," in the grandfather proviso includes both banking and non-banking subsidiaries. The definition of "subsidiary" in section 1841(d)(3) does not expressly address the question, and the section heading of section 1843(a) provided support for the proposition that the word, "subsidiary," in the grandfather proviso, could not include a banking subsidiary.

Congress, itself, has expressly defined. As we have previously discussed, there is no intrinsic or extrinsic indication that such should be done, and to do so under these circumstances would, in our view, more likely frustrate, rather than effectuate, the Congressional aims.

Moreover, the legislative history reveals that after careful consideration and the rejection of several alternative plans, Congress chose to give the section 1843(a)(2) grandfather proviso a rather broad sweep. Congress sought, through the proviso, to allow eligible one-bank holding companies " . . . to continue to engage in the activities and retain the subsidiaries they held . . . , rather than requiring them to cease the activity or divest the subsidiary." S.Rep. No.91–1084, 91st Cong., 2d Sess. 4 (1970) (1970 U.S.Code Cong. & Admin.News, pp. 5519, 5523). There is no reason to believe that Congress, which had contemporaneously recognized that a bank holding company could create a subsidiary by acquiring the power to exercise a controlling influence over a company' management or policies, intended to treat controlling influence subsidiaries any differently from those subsidiaries recognized pursuant to sections 1841(d)(1) and (d)(2).

Further, there is no basis for any assumption that grandfather rights established pursuant to the controlling influence test will lead to anti-competitive abuses capable of frustrating the objectives of the Act. Congress clearly recognized that grandfather rights, regardless of how they are established, might lead to future abuses, and Congress provided an appropriate safeguard against such eventualities in the Board's power to terminate grandfather rights, regardless of how established, "to prevent undue concentration of resources, decreased or unfair competition, conflicts of interest, or unsound banking practices." 12 U.S.C. § 1843(a)(2) (1970).

■ We recognize that courts must accord great weight to the interpretations given a statute by the agency charged with the statute's administration. This is particularly true when, as here, the statute is relatively new and the agency's officers played an important role in the statute's drafting and consideration. Zuber v. Allen, 396 U.S. 168, 192–93, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). Nevertheless, an agency's interpretation, not always infallible, cannot be controlling, and the courts must remain as the final authorities on critical questions of statutory construction. Volkswagenwerk Aktiengesellschaft v. Federal Maritime Commission, 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968); see First National Bank in Billings v. First Bank Stock Corp., 306 F.2d 937, 941 (9th Cir. 1962). There is no requirement that the courts must defer to an administrative interpretation when there are compelling indications that the administrative interpretation is wrong. Espinoza v. Farah Manufacturing Co., Inc., 414 U.S. 86, 94–95, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973). After the most careful and deliberate consideration, we have concluded that we cannot accept the Board's view that the section 1841(d)(3) definition of "subsidiary," does not apply to "subsidiary" as it appears in the grandfather proviso. As we have heretofore discussed, the language of the statute, itself, provides a compelling indication that the Board's position is mistaken, and the Board's view finds no support in the pertinent legislative history. Cf. Western Bancshares, Inc. v. Board of Governors of the Federal Reserve System, 480 F.2d 749, 753–54 (10th Cir. 1973).

Our decision to reject the Board's interpretation of the questioned statutory provisions is further fortified by our inability to harmonize certain of the Board's prior decisions construing the similar controlling influence test that appears in the section 1841(a)(2) definition of "bank holding company." In Ribsco, Inc., 38 Fed.Reg. 7092 (1973), the Board refused to determine whether on June 30, 1968, Ribsco, a holding company, exercised a controlling influence over a particular bank. Ribsco had sought, through an

application to the Board for a determination pursuant to section 1841(a)(2)(C), to establish that on June 30, 1968, it was a bank holding company. In Trust Company of New Jersey, 37 Fed.Reg. 15761, 58 Fed.Res.Bull. 717 (1972), however, the Board, processing a similar application for a section 1841(a)(2)(C) determination, did undertake to determine whether the Wilshire Oil Company, on June 30, 1968, exercised a controlling influence over the Trust Company of New Jersey, a bank. These inconsistent prior adjudications, which are among the very few previous examples of the Board's prior consideration of the controlling influence tests, indicate that the position that the Board advances with respect to Patagonia is not the type of consistent, clearly articulated administrative interpretation of a statute with which the courts are generally reluctant to interfere. *Cf.* Federal Maritime Commission v. Seatrain Lines, Inc., 411 U.S. 726, 745–46, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973).[11]

■ Our obligation in the imperfect process of statutory construction is to effectuate the Congressional intent, and, beyond doubt, the best evidence of that intent is the text of the statute itself. *See* Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L. Rev. 527, 535–38 (1947). We have found no evidence of a different Congressional intent that could justify our departing from the self-evident meaning of the statutory provisions here in question. Accordingly, we hold that the controlling influence definition of "subsidiary," which appears in section 1841(d)(3), applies to the word, "subsidiary," as it is used within the grandfather clause of section 1843(a)(2).

■ We further hold that an affected bank holding company must be able to initiate a Board determination as to whether the required controlling influence existed on June 30, 1968. To conclude otherwise would render the controlling influence test a nullity within the context of the grandfather clause, since there would be no party with both motivation and authority to set a controlling influence determination in motion. Interpretations that nullify statutory provisions or render them superfluous are, and should be, disfavored. *See, e. g.,* Tabor v. Ulloa, 323 F.2d 823, 824 (9th Cir. 1963).

## IV. *Application of the Controlling Influence Test*

■ Assuming *arguendo* that the section 1841(d)(3) definition of "subsidiary" does apply to "subsidiary" as it appears within the grandfather proviso, counsel for the Board have advanced two additional arguments concerning the proper application of the controlling influence test which, if correct, might serve to validate the Board's June 29, 1973, order of divestiture. Initially we note that these arguments are not mentioned in the Board Secretary's July 6, 1973, letter as rationales upon which the Board based its decision with respect to Patagonia. Rather, the arguments are counsels' *post hoc* rationalizations for the Board's action. As such, they are entitled to careful consideration, but not to the "great weight" accorded to carefully considered and articulated views set forth by the Board. Investment Company Institute v. Camp, 401 U.S. 617, 627–28, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971).

11. It is of interest to note that under the Act, the Board's administrative mandate is not open ended. Congress did not write the Act in general terms, thus leaving extensive areas of law to be developed by the Board. Rather, the Board is charged with responsibility for administering relatively specific statutory provisions. *See* Western Bancshares, Inc. v. Board of Governors, 480 F.2d 749, 753–54 (10th Cir. 1973); 15 B.C.Ind. & Com.L.Rev. 369 (1973). Congress surely did not intend that the Board would be empowered to expand or constrict the statutory definition of "subsidiary" or the grandfather proviso, the scope of which Congress carefully considered, in accordance with the Board's conception of regulatory needs. That the Board's mandate under the Act is relatively circumscribed is also relevant in determining the extent to which courts must defer to the Board's interpretation of the Act. *See* Burns v. Alcala, 420 U.S. 575, 590, n.3, 95 S.Ct. 1180, 1189 n.3, 43 L.Ed.2d 469 n.3 (1975) (Marshall, J., dissenting).

First, counsel contend that even if the Board were to determine that Patagonia exercised a controlling influence over Pima, the determination could be effective only as of the date it was rendered. Counsel assert that the determination could not "relate back" to June 30, 1968. In support of this argument, counsel cite the Board's decision in Ribsco, Inc., 38 Fed.Reg. 7092 (1973), in which the Board stated that a controlling influence determination could not "relate back" to a date before its making.

As discussed earlier, however, the Board's primary holding in *Ribsco* was that section 1841(a)(2)(C) does not entitle a holding company to a Board determination as to whether it exercised a controlling influence over a bank on June 30, 1968, for the purpose of conferring grandfather benefits. In *Ribsco,* the Board carefully stated its view that Congress added section 1841(a)(2)(C) to the Act only for the purpose of expanding the Board's jurisdiction. The Board's statement that a controlling influence determination cannot "relate back" to a date beyond its making was merely a corollary to the Board's principal position concerning the limited applicability of the controlling influence test.

█ It is true that when the Board undertakes a controlling influence determination for the purpose of extending its regulation to a bank holding company or a bank holding company subsidiary, the determination would need to be effective only as of the date of its making. Since we have rejected the Board's view that the controlling influence test cannot be applied for the purpose of conferring grandfather benefits, however, the Board's "relation-back" corollary also must fall. When the Board undertakes a controlling influence determination for the purpose of ascertaining a holding company's eligibility for grandfather benefits, the issue before the Board must be whether the asserted controlling influence existed on June 30, 1968, regardless of when the Board's determination is made.

█ Second, the Board's counsel argue that if the Board must determine whether Pima was Patagonia's subsidiary on June 30, 1968, it may do so only by applying the definitions of "subsidiary" that the Act contained on that date. As we have previously said, those definitions required the holding company either to vote 25 percent of the subsidiary's stock or elect a majority of the subsidiary's directors. See 12 U.S.C. §§ 1841(d)(1)–(d)(2) (1970). Counsel offer little support for this argument, and we have found none, either in the statute or the legislative history. The argument, again, would have the effect of rendering the controlling influence test a nullity within the context of the grandfather proviso, and we simply cannot believe that Congress intended such a result. Counsel brand the view that the Board could apply the controlling influence test to facts in existence on June 30, 1968, as a "retroactive" application of the 1970 Amendments, attempting, perhaps, to raise the traditional presumption against retroactivity. See, e. g., United States v. Perry, 431 F.2d 1020, 1023 (9th Cir. 1972). The attempt misses the mark. That a statute's operation depends, as here, upon the existence of antecedent facts does not give retroactive effect to the statute. Cox v. Hart, 260 U.S. 427, 435, 43 S.Ct. 154, 67 L.Ed. 332 (1922); Lohf v. Casey, 466 F.2d 618, 620 (10th Cir. 1972).

## V. Increased Ownership of Pima Stock

█ In a more sweeping argument, the Board's counsel contend that even if Patagonia were entitled through the section 1843(a)(2) grandfather proviso to engage, through Pima, in the savings and loan business, the entitlement would not authorize Patagonia to increase its ownership in Pima beyond the 20.005 percent that it held on June 30, 1968. Counsel assert that the grandfather proviso permits a holding company to retain only those interests that it owned on the crucial date. In our view, this contention is thoroughly contradicted by the language

of the statute, the Congressional committee reports, and one of the Board's own recent interpretive rulings.

Section 1843(a)(2) clearly contemplates that bank holding companies may expand the activities for which they have grandfather rights. The section specifically prohibits such expansion " . . . through the acquisition . . . of any interest in or the assets of a going concern engaged in such activities." The prohibition would be wholly superfluous if expansion were prohibited altogether.

The legislative record specifically states that internal expansion of grandfathered activities is permitted by the statute. In its report on the proposed legislation, the Senate Banking and Currency Committee, wherein the grandfather proviso originated, wrote:

> The committee believes that it is entirely appropriate for a company to be allowed to . . . expand [its grandfathered activities] so long as such expansion does not produce anticompetitive or other adverse effects. Accordingly, the committee provided that such a company could not acquire, either by stock acquisition or purchase of the assets, a going concern engaged in the grandfathered activities.

S.Rep.No.91–1084, 91st Cong., 2d Sess. 5 (1970) (1970 U.S.Code Cong. & Admin. News, 5519, 5524).[12]

The Board, on a recent occasion, has taken the position that a holding company may internally expand a grandfathered activity without prior Board approval. In a November 15, 1974, letter responding to an inquiry on behalf of the Purolator Corporation, CCH Fed.Banking L.Rep. ¶ 96,392 (1974), the Board concluded that a non-banking, grandfathered subsidiary of the Cameron Financial Corporation could expand its courier business to another state without prior

Board approval. In pertinent part, the Board's letter reads:

> Congress has . . . indicated . . . that expansion of grandfathered activities through internal growth would have a favorable competitive effect and, accordingly, did not place restrictions upon such method of expansion. Cameron proposes to expand its courier activities through internal growth, and the Board believes that Cameron may do this without obtaining prior approval. To conclude otherwise would severely limit the ability of grandfathered subsidiaries of bank holding companies to maintain their competitive positions relative to other companies or their industry.

Congress's reason for prohibiting the expansion of a grandfathered activity through the acquisition of an interest in, or the assets of, a "going concern" engaged in the grandfathered business was " . . . that such acquisition would tend to have an anticompetitive effect in that it would reduce the number of firms competing against each other in a given activity." S.Rep.No.91–1084, *supra* at 5 (1970 U.S.Code Cong. & Admin. News at p. 5524). If Patagonia already held Pima as a subsidiary on June 30, 1968, Patagonia's acquisition of the remainder of Pima's stock after that date could not reasonably be viewed as a violation of the "going concern" limitation. For Patagonia to have strengthened its already established power to control Pima would have had no adverse impact on the competition that existed among savings and loan institutions.

## VI. *The Type of Hearing to which Patagonia is Entitled*

Finally, the Board contends that if section 1841(d)(3) requires it to make a determination whether Patagonia had

12. See also the remarks of Senator Sparkman, Chairman of the Senate Banking and Currency Committee and a member of the conference committee, 116 Cong.Rec. 42424 (1970): "It is entirely appropriate . . . for a company to be allowed to continue to engage in those activities in which it was engaged on June 30, 1968, and to expand those activities other than by such anticompetitive acquisitions."

the power to exercise a controlling influence over Pima on June 30, 1968, the section does not require the Board to afford Patagonia a trial-type hearing. Consequently, the Board argues, its careful study of the facts, affidavits, and memoranda that Patagonia submitted in support of its application for a controlling influence determination, together with the Board Secretary's July 6, 1973, letter informing Patagonia of the Board's decision that Patagonia did not have the power to exercise a controlling influence over Pima, fulfilled all procedural requirements for the determination. Patagonia contends, on the other hand, that it is entitled to a full, evidentiary hearing, with an opportunity to present oral evidence and cross-examine any witnesses against it.

 Patagonia's application for a section 1841(d)(3) controlling influence determination confronts the Board with a question of "adjudicative," not "legislative," fact. In the context of administrative law, legislative facts are those that affect an industry as a whole. An agency may resolve legislative questions through rule-making, relying on generalized data concerning an industry, the agency's special expertise, and policy considerations. The rules thereby evolved may be applied to particularized situations without formal hearings. Adjudicative facts are those that immediately affect only specific litigants. Questions of adjudicative fact must be resolved on the basis of the evidentiary submissions of the parties. They are the types of questions that in a trial would normally be submitted to a jury, or to a judge as the finder of facts. 1 K. Davis, Administrative Law Treatise § 7.02 (1958). *Compare* BankAmerica Corp. v. Board of Governors of the Federal Reserve System, 491 F.2d 985 (9th Cir.

1974) (presenting a question of legislative fact) *with* American Bancorporation, Inc. v. Board of Governors of the Federal Reserve System, 509 F.2d 29, 35–39 (8th Cir. 1974) (listing several questions of adjudicative fact). *See* O'Brien, Federal Reserve: Administrative Procedure and the Right to Be Heard under the Bank Holding Company Act, 91 Banking L.J. 856 (1974).

As to Patagonia, the Board must determine whether a particular business relationship existed between two business entities on a certain date. Disputed questions of adjudicative fact normally are not decided without affording to the party that may be adversely affected an evidentiary hearing in which that party has the opportunity to confront witnesses and to hear and contest the evidence against him. American Bancorporation, Inc. v. Board of Governors, *supra* at 37 (quoting 1 K. Davis, *supra*); *see* Commercial National Bank of Little Rock v. Board of Governors of the Federal Reserve System, 451 F.2d 86, 90–91 (8th Cir. 1971); O'Brien, *supra*.[13]

The Board argues, nevertheless, that Patagonia's application failed to create a factual dispute that would require an adversary hearing. We disagree. The basic factual issue is whether Patagonia had the power to exercise the asserted controlling influence over Pima. Without attempting to identify all of the underlying questions, we note only that significant factual disputes exist. For example, Patagonia asserts that the three directors that it had placed on Pima's Board were able, through their influence, to control the Board's decisions. Patagonia submitted evidence, in the form of affidavits, to that effect. As is pointed out in the Board Secretary's July 6, 1973, letter, the Board, relying on the asserted prestige and influ-

---

**13.** We do not consider the question whether the Board may, through rule-making, establish reasonable regulations that might affect the need for formal hearings in controlling influence determinations. For section 1841(a)(2)(C), which establishes a controlling influence test for determining when a holding company controls a bank, the Board has established a series of presumptions, some conclusive and others rebuttable, based upon stock ownership and control of members of the bank's board of directors. 12 C.F.R. § 225.2 (1974). No such presumptions applicable expressly to section 1841(d)(2) have been established.

ence of certain of Pima's non-Patagonia directors and on the relatively short period of time during which the Patagonia directors had served, disagreed. Patagonia also contends that as of June 30, 1968, its plan to purchase the remainder of Pima's stock was well known and apparently unopposed. The Board contends, *inter alia,* that Pima's other shareholders had formed a voting trust to resist Patagonia's plan and were negotiating with other prospective purchasers.

We also reject the Board's argument that Patagonia waived its right to a formal hearing by failing to demand such a hearing during the course of the Board's review of the propriety of Patagonia's 20.005 percent ownership of Pima on June 30, 1968. Relying on the Board's October 19, 1972, notice in the Federal Register, Patagonia justifiably considered the Board's determination as to its 20.005 percent ownership of Pima to be separate from its application for a controlling influence determination. As to the latter, Patagonia clearly requested an evidentiary hearing.

We cannot hold, as Patagonia has requested, that the documentary evidence it submitted to the Board established, as a matter of law, that the asserted power to exercise a controlling influence of Pima existed. But Patagonia's documentation did raise genuine factual disputes that must be resolved in a trial-type adversary hearing before the Board.[14]

Since the Board, on remand, must make a *de novo* determination, we need not reach the merits of Patagonia's final contention, *i. e.,* that in the Board's prior review of Patagonia's application, the Board erroneously defined the statutory term, "controlling influence." On remand, the Board will also direct its consideration to this contention.

The challenged Order, requiring Patagonia to divest itself of that portion of Pima's stock that Patagonia acquired after June 30, 1968, is vacated,[15] and the cause is remanded to the Board for further proceedings not inconsistent with this Opinion.

So ordered.

---

**14.** The Board's Rules of Practice for Formal Hearings are set forth at 12 C.F.R. §§ 263.1 *et seq.* (1974).

**15.** *See supra* n.1.