SOUTHEAST ALASKA CONSERVA-
TION COUNCIL, INC., Plaintiff,

v.

James WATSON, Forest Supervisor, United States Forest Service, John Sandor, Regional Forester, United States Department of Agriculture, Max R. Peterson, Chief, United States Forest Service, John B. Crowell, Assistant Secretary of Agriculture, John R. Block, Secretary of Agriculture, Defendants,

and

Pacific Coast Molybdenum Company and United States Borax and Chemical Corporation, Intervenors-Defendants.

No. J81–12 Civil.

United States District Court,
D. Alaska.

Nov. 13, 1981.

---

Michael T. Thomas, Anchorage, Alaska, Clyde O. Martz, Charles L. Kaiser, Davis, Graham & Stubbs, Denver, Colo., for intervenors-defendants.

Durwood J. Zaelke, and Michael R. Sherwood, Sierra Club Legal Defense Fund, Inc., Juneau, Alaska, for plaintiff.

Cynthia L. Pickering, Atty., Land and Natural Resources Division, U. S. Dept. of Justice, Sue Ellen Tatter, Asst. U. S. Atty., Michael Spaan, U. S. Atty., Anchorage, Alaska, for defendants.

## MEMORANDUM AND ORDER

JAMES VON DER HEYDT, Chief Judge.

THIS CAUSE comes before the court on review of defendants' approval of certain mining activities within the Misty Fjords National Monument. The court's jurisdiction arises under the laws of the United States. 28 U.S.C. § 1331(a).

## I. BACKGROUND

In 1974, U.S. Borax and Chemical Corporation (U.S. Borax) conducted a geochemical exploration program within the Tongass National Forest in southeast Alaska. The exploration led to the discovery and acquisition of mining claims in a substantial molybdenum deposit.[1] The deposit is located in Quartz Hill, a knoll in an elevated valley in a mountainous region of the Misty Fjords National Monument.[2] The Misty Fjords National Monument is administered by defendant Forest Service, an agency within the Department of Agriculture.

Based on information through 1979, it is estimated that Quartz Hill contains one of the largest known molybdenum deposits in the world. Quartz Hill could hold as much as ten percent of the world's known minable molybdenum reserves, and could supply as much as eighteen percent of the world's molybdenum demand.[3]

Since the 1974 discovery of molybdenum at Quartz Hill, U.S. Borax has engaged in various exploration activities. Specifically, the exploration activities have included geologic and aerial topographic mapping, surface surveying, core drilling, collection of surface samples and environmental baseline data, as well as the construction of a small exploration and development camp.[4]

In 1976 U.S. Borax sought to expand its exploration activity. It submitted a plan of operation, for Forest Service authorization, to construct a surface access road for bulk sampling.[5] Bulk sampling would be used to verify the extent and quality of the deposit, and to evaluate possible mining and milling processes.[6] Following preparation of an environmental impact statement (EIS), which addressed an access road for bulk sampling and the bulk sampling phase,[7] the Forest Service approved the plan. On appeal,

---

1. U.S. Borax subsequently conveyed its interest in the mining claims to Pacific Coast Molybdenum Co., an affiliate corporation. Pursuant to a contractual agreement U.S. Borax has continued to manage the project, designated by the Forest Service as the Quartz Hill Molybdenum Project.

2. The Misty Fjords National Monument lies within the Tongass National Forest. Quartz Hill lies on the watershed line which divides "the Blossom River and the Keta River surface water drainage areas...." Forest Service, United States Department of Agriculture, *Draft Mining Development Concepts Analysis Document for the U. S. Borax Molybdenum Claims at Quartz Hill*, 1–1 (Alaska Region Rpt. No. 129) [hereinafter cited as CAD].

3. *Id.* Molybdenum, a metal used principally to strengthen steel, is not in short supply. *See* Wall St.J., 10 August 1981, at 13, col. 1 (development of huge Colorado molybdenum project deferred because of oversupply).

4. CAD *supra*, note 2 at 1–4.

5. Forest Service regulations, established in 1974, require submission of a plan of operations "from any person proposing to conduct operations which might cause disturbance of surface resources" within a national forest. 36 CFR § 252.4(a) (1980). The Forest Service is required to conduct an environmental analysis in connection with a proposed operating plan. Following the analysis, the authorized officer must determine whether an environmental impact statement (EIS) is necessary. *Id.* § 252.-4(f).

6. CAD, *supra*, note 3 at 1–4.

7. *See* U.S.D.A. Forest Service Environmental Statement U.S. Borax Mining Access Road For The Quartz Hill Project, 18 July 1977 (plaintiff's exhibit no. 6). As the EIS states, only the access road, further exploration and bulk sampling were considered for authorization. *Id.* at 2.

however, the approval was overturned by the Secretary of Agriculture, who determined that the use of helicopter, rather than a road for access, would be adequate for bulk sampling.[8]

In 1979, U.S. Borax submitted an operating plan which proposed certain exploration on the claim including bulk sampling with helicopter access.[9] Approval was obtained for continued exploratory drilling, but withheld for bulk sampling.[10] The Forest Service asserted that any bulk sampling activity must be evaluated within the context of a separate in-depth environmental analysis.[11]

On 2 December, 1980, the Alaska National Interest Lands Conservation Act of 1980 (ANILCA), Pub.L.No.96–487, 94 Stat. 2371 (1980), was signed by President Carter.[12] Section 503 of ANILCA covered the National Forest System and specifically addressed U.S. Borax's mining claim at Quartz Hill. Special allowance was made for holders of valid mining claims within Misty Fjords National Monument. Additionally, the access road for bulk sampling and the bulk sampling phase proposed by U.S. Borax were addressed.

Following enactment of ANILCA, the Forest Service approved certain amendments to U.S. Borax's 1980–83 plan of operations.[13] After appealing the Forest Service approval of the Borax amendments,[14] plaintiff brought suit in this court alleging that the approved 1980–83 amendments in-

volve bulk sampling as previously proposed by U.S. Borax. Bulk sampling, plaintiff contends, cannot be authorized until an EIS is prepared as required by ANILCA. Additionally, plaintiff maintains that regardless of ANILCA the National Environmental Policy Act of 1969 (NEPA) requires an EIS prior to authorization of the 1980–83 amendments.[15]

Federal defendants and intervenor-defendants argue that the authorized amendments do not involve bulk sampling. Moreover, they assert that neither ANILCA nor NEPA require an EIS since the Forest Service has found that the amendments do not involve a major federal action which significantly affects the environment.

■ Initially, the court finds that plaintiff has standing to bring this action. Plaintiff alleges that its members have used and will continue to use the area proposed to be mined, as well as contiguous areas. Further plaintiff maintains that failure to prepare an EIS creates a risk that serious environmental impacts may be overlooked.

Plaintiff has made a sufficient allegation of a particularized injury. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973). Additionally, plaintiff has demonstrated a traceable causal connection between the claimed injury and the challenged conduct, *Duke Power Co. v. Carolina*

8. Decision of the Secretary, United States Department of Agriculture, 1 December 1978 (plaintiff's exhibit no. 7).

9. 1979 Operating Plan, Quartz Hill Project (plaintiff's exhibit no. 8).

10. Ketchikan Area, U.S. Borax at Quartz Hill, Amendment to CY 1978 Environmental Analysis (plaintiff's exhibit no. 10). *See also* Study Plan, U.S. Borax Bulk Sampling (plaintiff's exhibit no. 9).

11. Environmental Analysis, *supra*, note 10.

12. ANILCA designated approximately 105 million acres of federal land in Alaska to protect its resource values through permanent federal ownership.

13. The initial plan of operations for 1980–83 was approved by the Forest Service on 24 Jan-

uary 1980. The plan called for a continuation of activities authorized in previous operating plans. *See* Environmental Assessment Report for U.S. Borax Plan of Operations for 1980–83 at 3 (plaintiff's exhibit no. 12).

14. Although final resolution of plaintiff's appeal is still pending before the United States Department of Agriculture, the court does not consider exhaustion of administrative remedies to be an issue in the case. *Cf. Jette v. Bergland*, 579 F.2d 59, 62 (10th Cir. 1978) (similar case holding exhaustion would be futile when issue involves whether to prepare an EIS).

15. The court does not address plaintiff's NEPA argument, since the EIS issue is determined pursuant to ANILCA.

*Environmental Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978), and a strong likelihood that the requested relief will redress the claimed injury. *Id.* at 75 n. 20, 98 S.Ct. at 2631 n. 20.

## II. REVIEW OF THE FOREST SERVICE DECISION

### A. *Scope of Review*

■ In reviewing the Forest Service decision, the court must first determine the scope of its review. Here the court agrees with defendants; the court may not go outside the administrative record in this case.

Scope of review involves the extent of the court's inquiry in applying the standard of review. *Asarco, Inc. v. U. S. Environmental Protection Agency*, 616 F.2d 1153, 1158 (9th Cir. 1980). The predominate rule on scope of review was summarized in *Asarco*: "[A]gency action must be examined by scrutinizing the administrative record at the time the agency made its decision." *Id.* at 1159. When a reviewing court considers evidence outside the administrative record, it runs the risk of improperly substituting its judgment for that of the agency. The court must only consider whether the Forest Service made an erroneous decision based on the record before it. "If the court determines that the agency's course of inquiry was insufficient or inadequate, it . . . [will] remand the matter to the agency . . . ." *Asarco*, 616 F.2d at 1160; *Proietti v. Levi*, 530 F.2d 836, 838 (9th Cir. 1976) (if administrative record cannot sustain agency decision, the proper remedy is remand).

### B. *Standard of Review*

Determining the proper standard of review requires recognition that the Forest Service has made two decisions—one procedural and one substantive. The decision not to prepare an EIS prior to allowing the proposed amendments is procedural, while the decision to allow the proposed amendments is substantive. *Cf. Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1020 (9th Cir. 1980) (challenge raises procedural issue on adequacy of EIS, and substantive issue on allowing project to proceed).

■ In determining whether the Forest Service properly declined preparation of a full EIS, the court must consider whether the Forest Service's action was reasonable. *Portela v. Pierce*, 650 F.2d 210, 213 (9th Cir. 1981); *City and County of San Francisco v. United States*, 615 F.2d 498, 500 (9th Cir. 1980). The reasonableness of the procedural decision not to prepare an EIS is dependent on whether the Forest Service complied with ANILCA. Thus, the court must determine the requirements of ANILCA in reviewing the reasonableness of the Forest Service's decision.

■ When reviewing the Forest Service's substantive action allowing U.S. Borax to commence operation under the 1980–83 amendments, the court must look to § 706(2)(A) of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06 (1976). *See Warm Springs*, 621 F.2d at 1027. Subsection (A) requires the court to set aside the Forest Service decision if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." APA § 706(2)(A). When applying subsection (A) the court must consider whether the decision was based "on a consideration of all the relevant factors and whether there has been a clear error of judgment." *Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). If, however, the Forest Service has failed to provide a reasonable basis for the procedural decision, the court will not have to reach the merits of the substantive decision.

■ Finally, the court recognizes that great weight must be given to the Forest Service's interpretation of ANILCA. *See Nance v. Environmental Protection Agency*, 645 F.2d 701, 714 (9th Cir. 1981). Nevertheless, the Forest Service's interpretation of ANILCA is neither infallible nor always controlling, since the court is the final authority on important questions of statutory construction. *Patagonia Corp. v. Board of*

*Governors of the Federal Reserve System,* 517 F.2d 803, 812 (9th Cir. 1975). If there are compelling indications that the Forest Service's interpretation of ANILCA was wrong, the court will not defer to its interpretation. *Id.*

### III. SECTION 503 OF ANILCA

The requirements of § 503 of ANILCA determine whether the Forest Service's decision allowing the 1980–83 amendments without an EIS was reasonable. The court acknowledges that [a]bsent a clearly expressed legislative intent to the contrary, [the statutory] language must ordinarily be regarded as conclusive.... *Consumer Product Safety Commission v. GTE Sylvania,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Accordingly, congressional intent is determined from the language of ANILCA, unless there is clear contrary legislative history. *See Montana Wilderness Ass'n v. U. S. Forest Service,* 655 F.2d 951, 955 (9th Cir. 1981).

Section 503(f)(2)(A) of ANILCA recognizes the right of any holder of a valid mining claim within the Monuments "to carry out activities related to the exercise of rights under such claim in accordance with reasonable regulations promulgated by the Secretary ...." Here Congress recognizes the fact that "[m]ining has been accorded a special place in our laws relating to public lands." *United States v. Weiss,* 642 F.2d 296, 299 (9th Cir. 1981). As long as U. S. Borax complies with the laws of the United States, and local laws, any valid mining location it may have is accompanied by the exclusive right of possession and enjoyment. *Id. citing* the Mining Laws of 1872, 30 U.S.C. §§ 21–54 at § 26 (1976). Pursuant to the Mining Laws and § 503(f)(2)(A) of ANILCA, the Forest Service has allowed U. S. Borax to carry out exploration activities, subject to reasonable regulations.

Section 503(h)(1)–(5) of ANILCA addresses the issuance of a "special use permit for a surface access road for bulk sam-

pling...." *Id.* § 503(h)(1). The words "for a surface access road for bulk sampling" make clear that Congress envisoned construction of an access road for bulk sampling. Subsection (h)(2) requires U.S. Borax and the managing agencies to prepare a document analyzing mine development concepts. The analysis must include concepts considered for mine development; foreseeable environmental impacts of every development concept; and probable surface access needs for every development concept. Subsection (h)(2) manifests the concern of Congress for the environmental consequences of mine development and surface access for mine development.

Subsection (h)(3), the heart of this controversy, provides in relevant part:

The Secretary shall prepare an environmental impact statement (EIS) under the National Environmental Policy Act of 1969 which covers an access road for bulk sampling purposes and the bulk sampling phase proposed by United States Borax.... This EIS shall incorporate all relevant data and other information included in the EIS previously prepared by the Secretary on access to the Quartz Hill area....

ANILCA § 503(h)(3). The EIS must also include: 1) an evaluation of alternative surface access routes; 2) an evaluation of the impacts of alternatives on fish and wildlife; 3) an evaluation of whether an alternative route could be used as a mine development road; and 4) plans to evaluate the environmental impact of activities carried out under the plan of operations. *Id.* § 503(h)(3)(A)–(D).

The express terms of subsection (h)(3) show that an EIS must cover an "access road for bulk sampling purposes *and the bulk sampling phase proposed by United States Borax....*" (emphasis added). As defendants have correctly asserted, the words "bulk sampling phase proposed by United States Borax" refer to the U.S. Borax 1976 bulk sampling proposal.[16] The

**16.** *See* United States Attorney's *Brief In Opposition To Plaintiff's Motion For Preliminary In-*

*junction,* docket # 11, at 13 n.14. *See also* Intervenor-Defendants' *Memorandum In Sup-*

1976 proposal called for an access road for bulk sampling. The 1976 proposal led to a full EIS which covered the access road and bulk sampling.[17] This is the EIS referred to by Congress in § 503(h)(3) ("EIS shall incorporate all relevant data... included in EIS previously prepared....")

Section 503(h)(3) manifests Congress's belief that bulk sampling must be accomplished *via* an access road as proposed by U. S. Borax in 1976. Removal by helicopter access was not considered by Congress.[18] Since Congress thought bulk sampling must occur *via* an access road, it provided for one EIS covering an "access road for bulk sampling purposes and the bulk sampling phase...." The legislative history makes this clear: "[P]reparation of the environmental impact statement for access and bulk sampling... is to be prepared concurrently." S.Rep.No.96–413, 96th Cong. 2nd Sess. 209, *reprinted in* [1980] U.S.Code Cong. & Ad.News 5070, 5153. Under the scenario envisioned by Congress only one EIS addressing access and bulk sampling was necessary, since both would occur concurrently.

■ Here the court is faced with a situation in which both phases are not occurring concurrently (assuming the 1980–83 amendments involve bulk sampling). Nevertheless, Congress clearly intended an EIS to address an access road for bulk sampling and the bulk sampling phase—the two major actions addressed in the 1977 EIS. Accordingly, both the access road *and* the bulk sampling phase require an EIS pursuant to § 503(h)(3) of ANILCA. If the 1980–83 amendments authorize bulk sampling without an access road, an EIS is required.

■ Additionally, § 503(h)(4)(A) requires the EIS to precede authorization of the "surface access road for bulk sampling...." Thus, an EIS must precede authorization of bulk sampling without an access road. This is in accord with the general rule that an EIS precede rather than follow a major federal action. *See Cady v. Morton*, 527 F.2d 786, 794 (9th Cir. 1975). If the 1980–83 amendments involve bulk sampling such activities must cease until a full EIS addressing the amendments is prepared.

## IV. WHETHER THE FOREST SERVICE DECISION CAN BE SUSTAINED

Bulk sampling in relation to the activities of U. S. Borax at Quartz Hill has been described by the Forest Service:

> Bulk Sampling is a process involving underground mining ... done for the purpose of checking core drilling results.... [The bulk sampling] will be by shaft, tunnel or a combination of both. U.S. Borax anticipates 3,000 to 7,000 feet of drift or tunnel approximately $8' \times 12'$ and excavating up to 60,000 tons of rock.

U.S.D.A. Forest Service Environmental Statement at 4 (plaintiff's exhibit no. 6). This description of bulk sampling is found in the 1977 EIS referred to by Congress in § 503(h)(3) of ANILCA.

The 1977 EIS further describes bulk sampling as proposed by U.S. Borax. Following blasting and excavating tunnels, the blasted or broken rock is "hauled to an outside storage bin by standard underground load-haul-dump equipment." Forest Service Environmental Statement at 6. A temporary crushing plant crushes the rock to pass through a screen for sampling by a mechanical sampler. The retained sample is crushed and screened again, and a representative sample is collected and removed for pilot plant testing.[19] *Id.* at 6.

port Of Judgment For Defendants, docket # 103, at 11.

**17.** U. S. Attorney *Brief, supra,* note 17 at 21.

**18.** Federal Defendants agree with the court. They assert that "the question of whether bulk sampling could be accomplished and the samples removed by helicopter was not in contention," when Congress enacted ANILCA. *Id.*

**19.** The pilot plant test facility is located outside the mine site. The amount of rock shipped to the pilot plant is environmentally irrelevant. Environmentally, the concern must center on the number and size of the tunnels. This is because the amount of blasting as well as the total amount of rock excavated is directly correlated to the number and size of the tunnels.

The crushed ore not retained in the sample is "stockpiled and used for mill feed if the mine project proceeds or it will be spread, contoured and revegetated to minimize visual impact if the project is abandoned." *Id.*

The U. S. Borax 1976 bulk sampling plan proposed one to five tunnels with 8′ × 12′ openings for a total length of 3000 to 7000 feet. Additionally, an on-site crushing plant and a sampler were required. *Id.* at 4, 6 & 23. The 1979 bulk sampling plan proposed one tunnel with a 6′ × 8′ opening for a total length of up to 7000 feet. Again, an on-site crushing plant and a sampler were required. 1979 Operating Plan, Quartz Hill Project at 3 & 4 (plaintiff's exhibit no. 8); Study Plan, U. S. Borax Bulk Sampling at 1 (plaintiff's exhibit no. 9). The 1980–83 amendments allowed the construction of two tunnels, each with 7′ × 8′ openings for a total length of 5,300 feet. An on-site crushing plant and a sampler were allowed. U. S. D. A. Forest Service Environmental Assessment at 3, 4 & 23 (plaintiff's exhibit no. 17).

From a review of the administrative record it is obvious that the 1980–83 amendments allow the same magnitude of sampling which U. S. Borax stated was bulk sampling in 1976 and in 1979. The length and size of the authorized tunnels are substantially the same as the 1976 and the 1979 bulk sampling proposals. Accordingly, the amount of blasting and the total amount of rock excavated will be substantially the same. Additionally, the on-site crushing and the sampling activity appears to be the same as that proposed in 1976 and in 1979. Moreover, the objective of the 1980–83 amendments is apparently the same as the objective of 1976 and of 1979—bulk sampling.

The court has established that § 503(h)(3) of ANILCA mandates an EIS prior to approval of bulk sampling. Coupled with this is the fact that the administrative record shows a high probability that the 1980–83 amendments involve bulk sampling. This leads to the conclusion that the Forest Service has failed to provide a reasonable basis for its decision not to prepare a full EIS on the 1980–83 U. S. Borax amendments. It is obvious from the record that the Forest Service has not considered all the relevant factors.

Accordingly, IT IS ORDERED:

1) THAT this cause is remanded to the United States Forest Service for further consideration consistent with this memorandum.

2) THAT upon reconsideration, if the Forest Service establishes that the 1980–83 U. S. Borax amendments involve bulk sampling, it shall prepare a full EIS addressing the bulk sampling phase as required by § 503(h) of the Alaska National Interest Lands Conservation Act.

3) THAT plaintiff submit an appropriate order listing the activities under the 1980–83 U. S. Borax operating plan, which should be enjoined during U. S. Forest Service's reconsideration.

4) THAT the stipulation for preliminary injunction filed on 22 September 1981 is extended until further order of the court.

5) THAT the court retains jurisdiction in this cause to review the Forest Service's reconsideration of its approval of the 1980–83 U. S. Borax amendments.