697 F.2d 1305
 18 ERC 1785, 13 Envtl. L. Rep. 20,233
 SOUTHEAST ALASKA CONSERVATION COUNCIL, INC., Plaintiff-Appellee,
v.
James WATSON, Forest Supervisor, United States Forest
Service, et al., and Pacific Coast Molybdenum Co.,
and U.S. Borax & Chemical Corp.,
Defendants-Appellants.
 Nos. 82-3206, 82-3241.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 19, 1982.
Decided Jan. 31, 1983.
 
 Maria A. Iizuka, Dept. of Justice, Washington, D.C., argued, for defendants-appellants; Clyde O. Martz, Davis, Graham & Stubbs, Denver, Colo., on brief.
 Durwood J. Zaelke, Juneau, Alaska, for plaintiff-appellee.
 On Appeal from the United States District Court for the District of Alaska.
 Before PREGERSON, ALARCON and NELSON, Circuit Judges.
 NELSON, Circuit Judge:
 
 
 1
 Appellants challenge the district court's decision: (1) ordering preparation of a full environmental impact statement (EIS) addressing the proposed amendments to the 1980-83 plan of operations proposed by U.S. Borax & Chemical Corp. ("Borax") and Pacific Coast Molybdenum Co. ("PCM"); (2) enjoining Borax and PCM from mining activities pursuant to the amendments; and (3) enjoining the Forest Service from authorizing those mining activities.
 
 
 2
 The district court held that subsection 503(h)(3) of the Alaska National Interest Lands Conservation Act of 1980 requires an EIS for bulk sampling of the mineral deposit at Quartz Hill in the Tongass National Forest. The district court also found that the activities proposed by Borax and PCM in the 1980-83 amendments involve bulk sampling. Therefore, the district court concluded that a full EIS covering the 1980-83 amendment activities is required before approval of those activities by the Forest Service. We affirm the district court, 535 F.Supp. 653, 526 F.Supp. 202.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 3
 In 1974, Borax conducted a geochemical exploration in the Tongass National Forest in southeast Alaska. Borax discovered a large molybdenum deposit and obtained mining claims on the property. Borax conveyed its interest in the mining claims to PCM, an affiliated corporation, and contracted with PCM to manage the project.
 
 
 4
 The molybdenum deposit is located at Quartz Hill, a 149,000-acre area in an elevated valley of the Misty Fjords National Monument, which lies within the Tongass National Forest. "Misty Fjords is an essentially untouched 1.453 million-acre area ... representing nearly all of the wilderness features [and wildlife] found in southeast Alaska." S.Rep. No. 413, 96th Cong. 1st Sess. 208 (1979), reprinted in 1980 U.S.Code Cong. & Ad.News 5070, 5152. The Misty Fjords Monument also contains several salmon, trout, and crab fisheries. Id. at 5153.
 
 
 5
 The Misty Fjords Monument is administered by the Forest Service, an agency within the Department of Agriculture. The Forest Service has designated Borax and PCM's mining project as the Quartz Hill Molybdenum Project. Molybdenum is a metal used to strengthen steel in steel alloys. It is not rare or in short supply. See Wall St. J., Aug. 10, 1981, at 13, col. 1. Quartz Hill is estimated to be one of the largest known molybdenum deposits in the world. S.Rep. No. 413, 96th Cong. 1st Sess., at 209 (1979), reprinted in 1980 U.S.Code Cong. & Admin.News, at 5153. It contains an estimated 1.5 billion tons of the metal, or 10% of the world's known reserves.
 
 
 6
 Since the 1974 discovery at Quartz Hill, Borax has engaged in various exploration activities, including geologic and aerial topographic mapping; surveying; drilling 435 core holes; building and operating an employees' camp; and constructing helicopter pads, a crushing and sampling plant, and access roads.
 
 
 7
 In 1976, Borax submitted a plan of operations for Forest Service approval. In that plan, Borax proposed to expand its project by conducting bulk sampling and constructing a surface access road to transport the bulk sampling materials. The bulk sampling would be used to verify the extent and quality of the molybdenum deposit and to evaluate possible mining processes and alternatives for mine development. The Forest Service approved the plan in 1977, after preparing an environmental analysis and an EIS on both the bulk sampling and the access road.
 
 
 8
 On appeal by the Southeast Alaska Conservation Council, Inc. (SEACC), the Secretary of Agriculture overturned the approval in 1978, determining that access by helicopter, rather than by road, would be adequate for bulk sampling.
 
 
 9
 In 1979, Borax submitted another plan of operations, proposing further exploration, including bulk sampling with helicopter access to the site. The Forest Service approved continued exploratory drilling, but denied approval for bulk sampling. The Forest Service decided that any bulk sampling must be evaluated in a separate in-depth environmental analysis.
 
 
 10
 In January 1980, Borax's initial plan of operations for 1980-83 was approved by the Forest Service. The 1980-83 plan provided for continuation of activities authorized in previous operating plans, but it did not include bulk sampling or construction of an access road.
 
 
 11
 On December 2, 1980, President Carter signed the Alaska National Interest Lands Conservation Act of 1980, designating approximately 105 million acres of Alaska lands, including the Misty Fjords National Monument, as permanently protected federal lands. Alaska National Interest Lands Conservation Act of 1980, Pub.L. No. 96-487, 94 Stat. 2371 (codified in scattered sections of 16 and 43 U.S.C.) (hereinafter cited as ANILCA). Misty Fjords was closed to sale or harvest of timber and to operation of mining and mineral leasing. ANILCA exempted, however, those lands already held under valid mining claims. ANILCA Secs. 503(f)(1), (2); see S.Rep. No. 413, 96th Cong., 1st Sess., at 209, reprinted in 1980 U.S.Code Cong. & Ad.News, at 5153.
 
 
 12
 Congress specifically considered whether Borax should be permitted to develop its existing claim on Quartz Hill. The result, known as the "Borax Compromise," was embodied in ANILCA sections 503 and 505. ANILCA Secs. 503, 505.
 
 
 13
 After enactment of ANILCA, Borax submitted four proposed amendments to its already approved 1980-83 plan of operations (the 1980-83 amendments). The Forest Service appointed several experts to study the environmental effects of the proposed amendments. The experts prepared an "environmental assessment" pursuant to 36 C.F.R. Sec. 252.4(f). Based upon that assessment, the Forest Service made a "finding of no significant impact" on the environment, decided that no EIS was required, and approved the four proposed amendments. Amendments 1 and 2 added additional core drill hole locations to the existing plan. Amendments 3 and 4 provided for drilling more core holes, erecting additional campsite buildings, constructing an on-claim road connecting the campsite to work areas, opening two adits for underground exploration and sampling, clearing, and building "rock pads" (large level areas built into the side of a mountain for each adit), and removing 42 tons of crushed rock sample from the claims by helicopter for laboratory analysis.
 
 
 14
 SEACC appealed the Forest Service's approval of amendments 2, 3, and 4 to the Department of Agriculture. Meanwhile, Borax began work on the 1980-83 amendment activities. SEACC then brought suit in federal district court for an injunction, arguing that the approved 1980-83 amendment activities constitute bulk sampling as previously proposed by Borax in 1976 and 1979 and rejected by the Agriculture Department and the Forest Service. SEACC contended that the Forest Service could not authorize bulk sampling until an EIS was prepared as required by section 503(h)(3) of ANILCA. SEACC also argued that the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. Sec. 4332(2)(C) (1976), requires an EIS before authorization of the amendments. Borax and the Forest Service argued that the proposed amendments do not constitute bulk sampling and that neither ANILCA nor NEPA requires an EIS.
 
 
 15
 The district court held that ANILCA Sec. 503(h)(3) requires an EIS for bulk sampling. Southeast Alaska Conservation Council, Inc. v. Watson, 526 F.Supp. 202, 207-08 (D.Alaska 1981) (hereinafter referred to as SEACC I ). The court enjoined Borax from further activities under the 1980-83 amendments pending reconsideration by the Forest Service whether those amendment activities constituted bulk sampling. Id. at 209. The district court set forth guidelines for the Forest Service to use in deciding this factual issue. As a base point for comparison, the Forest Service was to use the descriptions of bulk sampling set forth in the 1977 EIS and in the proposed 1976 and 1979 plans of operations. Then, the Forest Service was to compare the 1980-83 amendment activities in terms of the magnitude of sampling, the length and size of the tunnels (which determine the amount of blasting and the total amount of rock excavated), the on-site crushing and sampling activity, and the overall objective of the proposed activities. Id. at 208-09.
 
 
 16
 On remand, the Forest Service concluded that the 1980-83 amendment activities did not constitute bulk sampling because the activities were distinguishable from the bulk sampling described in the 1977 EIS "in size, method, and purposes of operation." Forest Service Decision on Remand (Mar. 1, 1982), at 1. Borax then moved the district court to vacate the preliminary injunction.
 
 
 17
 In a second memorandum and order, the district court concluded that the Forest Service's decision was "arbitrary, capricious, and an abuse of discretion" because the Forest Service failed to consider all the relevant factors in making its determination. Southeast Alaska Conservation Council, Inc. v. Watson, 535 F.Supp. 653, 657 (D.Alaska 1982) (hereinafter cited as SEACC II ). The district court determined that a second remand to the Forest Service on the bulk sampling issue would frustrate the provisions of ANILCA section 503(h)(5) calling for expedited judicial review of any challenge of administrative action under section 503. Accordingly, the district court analyzed the 1980-83 amendment activities and found that those activities constitute bulk sampling. Id. at 659. The court referred to its decision in SEACC I, which held that ANILCA section 503(h)(3) requires an EIS before approval of bulk sampling activities. Id. at 658. Furthermore, the district court concluded that NEPA alone would mandate an EIS before approval of the 1980-83 amendment activities. Id. at 658 n. 5. Therefore, the district court ordered the Forest Service to prepare a full EIS for the 1980-83 amendments and enjoined the Forest Service from authorizing mining activities included in the 1980-83 amendments. Id. at 8.
 
 
 18
 On appeal, the Forest Service, PCM, and Borax argue (1) that neither ANILCA nor NEPA requires an EIS before approval of the 1980-83 amendment activities and (2) that the district court erred in finding that the 1980-83 amendment activities constitute bulk sampling. We affirm both the district court's holding that ANILCA requires an EIS for bulk sampling and the district court's finding that the 1980-83 amendment activities constitute bulk sampling. Because we conclude that ANILCA requires an EIS before Forest Service approval of the 1980-83 amendment activities, we do not reach the issue of whether NEPA alone requires an EIS.
 
 DISCUSSION
 
 19
 We note at the outset that although plaintiff's appeal was still pending before the Department of Agriculture, the district court did not consider exhaustion of administrative remedies to be an issue in this case. SEACC I, 526 F.Supp. at 205 n. 14. Unless application of the doctrine of exhaustion of administrative remedies is statutorily mandated, its application rests within the sound discretion of the trial court. Aleknagik Natives Ltd. v. Andrus, 648 F.2d 496 (9th Cir.1980); Eluska v. Andrus, 587 F.2d 996 (9th Cir.1978). Consequently, the court of appeals will not disturb the district court's decision on whether exhaustion of administrative remedies is required unless there has been a clear abuse of discretion. Medina v. Castillo, 627 F.2d 972, 975 (9th Cir.1980).
 
 
 20
 In this case, neither ANILCA nor the applicable Forest Service regulations mandate exhaustion of administrative remedies; therefore, the decision whether to require exhaustion of administrative remedies was within the discretion of the trial court. Exhaustion of administrative remedies is not required where administrative remedies are inadequate or not efficacious, where pursuit of administrative remedies would be a futile gesture, where irreparable injury will result unless immediate judicial review is permitted, or where the administrative proceeding would be void. Aleknagik Natives, 648 F.2d at 499.
 
 
 21
 In this case, the trial court did not abuse its discretion in deciding that exhaustion of administrative remedies was not required. Borax had already begun work on the 1980-83 amendment activities during the 1981 field season, and an immediate decision was required on the appropriateness of a preliminary injunction and on the necessity for an EIS. Cf. Jette v. Bergland, 579 F.2d 59, 62 (10th Cir.1978) ("Exceptions to the requirements of exhaustion have been made in NEPA cases when the drawbacks of the requirement outweigh the advantages in the circumstances of a particular case.")
 
 
 22
 I. Does ANILCA subsection 503(h)(3) require an EIS before approval of bulk sampling activities?
 
 
 23
 In SEACC I, the district court held that ANILCA subsection 503(h)(3) requires an EIS before authorization of bulk sampling of the mineral deposit at Quartz Hill even when bulk sampling is proposed without an access road. 526 F.Supp. at 208. This issue is purely a matter of statutory interpretation; therefore, our standard of review of the district court's interpretation of ANILCA is de novo.[1] Administrative Procedure Act, 5 U.S.C. Sec. 706 (1976); see Washington State Farm Bureau v. Marshall, 625 F.2d 296, 302 (9th Cir.1980). We agree with the district court that ANILCA subsection 503(h)(3) requires an EIS for bulk sampling.
 
 
 24
 The Supreme Court has stated that a statute should be read in light of its underlying purposes. Richards v. United States, 369 U.S. 1, 11, 82 S.Ct. 585, 592, 7 L.Ed.2d 492, 499 (1962) ("[A] section of a statute should not be read in isolation from the context of the whole act and ... in interpreting legislation 'we [should] ... look to the provisions of the whole law, and to its object and policy.' "). Accordingly, ANILCA should be interpreted in light of its underlying protective purposes: "to protect objects of ecological, cultural, geological, historical, prehistorical, and scientific interest." ANILCA Sec. 503(c) (emphasis added). See also ANILCA Sec. 101.
 
 
 25
 Congress drafted section 503 of ANILCA with the clear intention that holders of valid mining claims shall be permitted to carry out activities related to exercising rights under those claims, but Congress specified that any such activities shall be conducted "in accordance with reasonable regulations promulgated by the Secretary to assure that such activities are compatible, to the maximum extent feasible, with the purposes for which the Monuments were established." ANILCA Sec. 503(f)(2)(A) (emphasis added). The "maximum extent feasible" standard is a strict one and demands strict compliance with environmental protection provisions set forth in ANILCA and in other applicable environmental statutes. Cf. Flint Ridge Development Co. v. Scenic Rivers Ass'n, 426 U.S. 776, 787-88, 96 S.Ct. 2430, 2437-38, 49 L.Ed.2d 205, 215-16, reh'g denied, 429 U.S. 875, 97 S.Ct. 198, 50 L.Ed.2d 159 (1976) (interpreting NEPA mandate that agencies comply with the Act "to the fullest extent possible" as "neither accidental nor hyperbolic," but rather "a deliberate command" that agencies comply unless there is "a clear and unavoidable conflict with statutory authority").
 
 
 26
 "Absent a clearly expressed legislative intention to the contrary, [the statutory] language must ordinarily be regarded as conclusive." Consumer Product Safety Commission v. GTE Sylvania, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 776 (1980). Accordingly, congressional intent is determined from the clear language of ANILCA, unless there is clear contrary legislative history. See Montana Wilderness Ass'n v. U.S. Forest Service, 655 F.2d 951, 955 (9th Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).
 
 
 27
 Subsection 503(h)(3) of ANILCA provides in relevant part:
 
 
 28
 (3) The Secretary shall prepare an environmental impact statement (EIS) under the National Environmental Policy Act of 1969 which covers an access road for bulk sampling purposes and the bulk sampling phase proposed by United States Borax and Chemical Corporation in the Quartz Hill area.
 
 
 29
 The express language of 503(h)(3) should be interpreted to require an EIS for both the access road and for bulk sampling. Appellants contend that Congress intended to require an EIS for bulk sampling only if an access road were also proposed. The subsection contains no conditional language, however, to indicate that the bulk sampling EIS requirement depends upon the access road EIS. Rather, the relevant sentence was drafted with a parallel construction; therefore, Congress apparently intended to require an EIS for both the access road and the bulk sampling.
 
 
 30
 Appellants contend that subsection 503(h)(1) defines the following subsections and limits their interpretation. Subsection 503(h)(1) provides that "[a]ny special use permit for a surface access road for bulk sampling of the mineral deposit at Quartz Hill ... shall be issued in accordance with this subsection." ANILCA Sec. 503(h)(1). Appellants argue that subsections (h)(2) through (4) merely expand upon subsection (h)(1). Accordingly, appellants argue that (h)(3) should be interpreted in light of (h)(1) and therefore that (h)(3) does not require preparation of an EIS for bulk sampling unless application is made under (h)(1) for a special use permit for an access road.
 
 
 31
 Appellants' argument is not convincing. Subsections (h)(1) through (8) set forth several different kinds of provisions that allow development of the Quartz Hill mineral deposit subject to various environmental protection requirements. Subsections (2) through (8) are parallel subsections to (h)(1), and there is no indication that (h)(1) is intended to limit the interpretation of (h)(2) through (8) in any way.
 
 
 32
 Subsection (h)(2) requires preparation of a concepts analysis document (CAD) analyzing the various concepts under consideration for mine development, the general foreseeable environmental impacts of those concepts, the environmental studies that will be required, and the likely access routes for each concept. Subsection (h)(3) requires an EIS for an access road and for bulk sampling. Subsection (h)(4) provides a procedure for issuance of a special use permit for a bulk sampling access road. Subsection (h)(5) provides for expedited judicial review of any administrative action pursuant to section (h). Subsection (h)(6) allows the Secretary of Agriculture to permit use of the Misty Fjords National Monument Wilderness for certain activities related to mine development, subject to reasonable regulations for environmental protection. Subsection (h)(7) allows the Secretary to permit salvage, cleanup, or other activity related to mine development, including activities necessary due to emergency conditions. Finally, subsection (h)(8) provides that designation of the Misty Fjords National Monument Wilderness does not alter any substantive or procedural requirements otherwise applicable to the use of offshore waters for activities related to mine development.
 
 
 33
 Thus, subsections (h)(1) through (8) are parallel subsections and there is nothing to indicate that (h)(1) is meant to limit the interpretation of (h)(2) through (8). Consequently, the most reasonable interpretation of subsection (h)(3) is that Congress intended to require an EIS for both the access road and for bulk sampling. There is no language to indicate that (h)(3) requires an EIS for bulk sampling only if application is made for a special use permit for an access road.
 
 
 34
 Rather, Congress appears to have been considering both the access road and bulk sampling when it drafted subsection 503(h)(3). When it enacted ANILCA on January 1, 1980, Congress was aware of the previous attempts by Borax to obtain approval for both bulk sampling and an access road. Borax first submitted a plan of operations proposing bulk sampling and an access road in 1976. In response, the Forest Service prepared a 1977 EIS on both bulk sampling and the access road. This is the EIS referred to by Congress in subsection 503(h)(3): "[The] EIS shall incorporate all relevant data and other information included in the EIS previously prepared by the Secretary ...." In 1977, the Forest Service approved both the bulk sampling and the access road on the basis of the information contained in the 1977 EIS. In 1978, however, the Secretary of Agriculture overturned the approval and required access by helicopter instead of a road. In 1979, Borax submitted a plan of operations proposing continued exploratory drilling and bulk sampling with helicopter access. The Forest Service approved the exploratory drilling, but denied the bulk sampling, deciding that a more in-depth environmental analysis was required.
 
 
 35
 The provisions of subsection 503(h)(3) can be viewed as a Congressional response to this history of attempts by Borax to obtain approval for both bulk sampling and an access road. In subsection 503(h)(3), Congress provided a procedure for obtaining a special use permit for an access road for bulk sampling purposes, thus contravening the 1978 decision by the Secretary of Agriculture denying the access road and requiring helicopter access. Furthermore, Congress required an updated and expanded version of the 1977 EIS, which had covered both bulk sampling and an access road. Thus, in 503(h)(3), Congress implicitly affirmed the 1979 Forest Service decision that a more in-depth environmental analysis was required before approval of bulk sampling.
 
 
 36
 Therefore, the most reasonable interpretation of subsection 503(h)(3) is that Congress intended to require an EIS for both the access road and for bulk sampling. We agree with the district court that ANILCA subsection 503(h)(3) requires an EIS for bulk sampling even if no application is made for a special use permit for an access road.[2]
 
 
 37
 II. Did the Forest Service abuse its discretion by deciding that the 1980-83 amendment activities did not constitute bulk sampling?
 
 
 38
 In SEACC I, the district court remanded to the Forest Service to consider whether the 1980-83 amendments involve bulk sampling. 526 F.Supp. at 209. On remand the Forest Service concluded that the 1980-83 amendment activities did not constitute bulk sampling. Forest Service Decision on Remand (Mar. 1, 1982), at 1. In a second memorandum and order, the district court concluded that the Forest Service's decision was "arbitrary, capricious, and an abuse of discretion" because it was not based upon a consideration of all the relevant factors. SEACC II, 535 F.Supp. at 657. The district court then analyzed the 1980-83 amendment activities and found that those activities constitute bulk sampling. Id. at 659. We affirm both the district court's determination that the Forest Service's decision on remand was arbitrary and capricious and the district court's finding that the 1980-83 amendment activities constitute bulk sampling.
 
 
 39
 In SEACC II, the district court applied the proper standard of review to the Forest Service's decision on remand. The Forest Service's determination that the 1980-83 amendment activities did not constitute bulk sampling was a finding of fact. Under section 706 of the Administrative Procedure Act, a reviewing court shall set aside findings of fact by an administrative agency that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. Sec. 706(2)(A) (1976). In applying this standard, the reviewing court must consider whether the agency's finding was based "on a consideration of all the relevant factors and whether there has been a clear error of judgment." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136, 153 (1971).
 
 
 40
 In reviewing the district court's decision that the Forest Service's finding of fact was arbitrary and capricious, this court should apply the same standard of review. Cf. Asarco, Inc. v. Environmental Protection Agency, 616 F.2d 1153, 1161 (9th Cir.1980) ("District court review of agency action is generally accorded no particular deference, because the district court, limited to the administrative record, is in no better position to review the agency than the Court of Appeals."). Thus, the appellate court may review the administrative record and determine for itself whether the Forest Service's finding of fact was arbitrary, capricious, or an abuse of discretion. See Environmental Defense Fund, Inc. v. Costle, 657 F.2d 275, 282-83 (D.C.Cir.1981) (appellate court's inquiry into facts must be searching and careful; court must be assured that the agency has exercised a reasoned discretion); Edwards v. Califano, 619 F.2d 865, 868 (10th Cir.1980) (appellate standard of review same as district court's under 5 U.S.C. Sec. 706(2)(A)).
 
 
 41
 We agree with the district court that the Forest Service was arbitrary and capricious and abused its discretion when it found that the 1980-83 amendment activities did not constitute bulk sampling. In SEACC I, the district court pointed to the striking similarities between the activities authorized in the 1980-83 amendments and those described in the bulk sampling proposals contained in the 1976 and 1979 plans of operations. 526 F.Supp. at 209. The district court also set forth several factors for the Forest Service to consider in determining whether the 1980-83 amendment activities constituted bulk sampling: (1) the length and size of the tunnels, (2) the amount of blasting, (3) the total amount of rock excavated, and (4) the amount of on-site crushing and sampling activity. Id. The district court stated that:
 
 
 42
 The amount of rock shipped to the pilot plant is environmentally irrelevant. Environmentally, the concern must center on the number and size of the tunnels. This is because the amount of blasting as well as the total amount of rock excavated is directly correlated to the number and size of the tunnels.
 
 
 43
 Id. at 208 n. 5.
 
 
 44
 On remand the Forest Service found that the 1980-83 amendment activities were not bulk sampling because they differed from the bulk sampling analyzed in the 1977 EIS "in size, method, and purposes of operation." Forest Service Decision on Remand (Mar. 1, 1982), at 1. The Forest Service stated that "the most striking distinction between the 1977 EIS bulk sample description and the 1980-83 exploration amendments is the tonnage to be removed from the project area." Id. at 3-4. The 1976 plan of operations proposed the removal of 5,000 tons; whereas the 1980-83 amendments proposed the removal of 42,000 tons. Id.
 
 
 45
 The district court was correct in determining that the Forest Service's finding was arbitrary and capricious because it was not based upon consideration of the relevant factors. First, the Forest Service compared the 1980-83 amendment activities only to the 1976 bulk sampling proposal analyzed in the 1977 EIS; no mention was made of the 1979 bulk sampling proposal. Second, the Forest Service failed to consider the factors set forth in SEACC I. Instead, the Forest Service distinguished the 1980-83 amendment activities principally on the basis of the amount of blasted and crushed rock to be removed from the site, a factor considered environmentally irrelevant in SEACC I. As the district court correctly pointed out in SEACC II, "[A]lthough the amount of rock to be removed from the mine site is a factor in determining whether bulk sampling is occurring, it is certainly not dispositive." 535 F.Supp. at 657. Thus the district court was correct in concluding that the Forest Service's finding was arbitrary and capricious because it was not based on the relevant factors.
 
 
 46
 The district court was also correct in finding that the 1980-83 amendment activities constitute bulk sampling. When examined in light of the factors set forth in SEACC I, the 1980-83 amendment activities are essentially the same as the activities proposed in 1976 and 1979 under the bulk sampling label. The length and size of the proposed tunnels are substantially the same in all three proposals. SEACC I, 526 F.Supp. at 209. The amount of rock to be excavated is approximately the same in all three proposals. Id. Thus, the amount of blasting would be comparable. The amount of on-site crushing, processing, and sampling is also similar. Id.
 
 
 47
 If the activities proposed in the 1976 and 1979 plans of operations constituted bulk sampling, then the 1980-83 amendment activities must also constitute bulk sampling. A different stated purpose for the blasting and excavating, and a smaller amount of rock removed from the site should not affect other considerations.
 
 CONCLUSION
 
 48
 For the reasons stated above, we agree with the district court that ANILCA subsection 503(h)(3) requires an EIS for bulk sampling and that the activities set forth in amendments 2, 3, and 4 to the 1980-83 plan of operations constitute bulk sampling. Therefore, an EIS covering the activities set forth in amendments 2, 3, and 4 is required before Forest Service approval of those activities.
 
 
 49
 AFFIRMED.
 
 
 
 [1]
 A reviewing court should accord great weight to agency interpretations of federal statutes, Nance v. EPA, 645 F.2d 701, 714 (9th Cir.1981). In this case, however, the Forest Service never reached the issue of whether ANILCA Sec. 503(h)(3) requires an EIS for bulk sampling because the Forest Service did not characterize the 1980-83 amendment activities as bulk sampling. Even if the Forest Service had reached the issue, the agency's interpretation should not necessarily be controlling, since the court is the final authority on important questions of statutory construction. Patagonia Corp. v. Board of Governors of the Federal Reserve System, 517 F.2d 803, 812 (9th Cir.1975)
 
 
 [2]
 We note that Borax has applied for a special use permit for an access road and that the Forest Service has prepared an EIS covering the access road and future bulk sampling. That EIS does not cover the 1980-83 amendment activities, however. Because we agree with the district court's finding that the activities set forth in amendments 2, 3 and 4 of the 1980-83 amendments constitute bulk sampling, an EIS covering those activities is required before any Forest Service approval. See discussion infra at 1311-1313